12 CV 04122

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED
MAY 23 2012
PRO SE OFFICE

| | |
|---|---|
| STEPHEN A. MILLER,<br>　　　　　Plaintiffs,<br><br>　　- against -<br><br>PACIFIC INVESTMENT MANAGEMENT Company LLC,<br>PIMCO FUNDS,<br>CME GROUP INC.<br>Mohamed A. El-Erian　　(PIMCO)<br>Stephen A. Rodosky　　(PIMCO)<br>Kathleen Cronin　　　　(CME)<br>Joseph P. Adamczyk　　(CME)<br>　　　　　Defendants | COMPLAINT<br><br><br><br>JURY TRIAL<br>DEMANDED |

## COMPLAINT

Plaintiff Stephen A. Miller, brings the Commodity Exchange Act ("CEA") action on behalf of himself. Plaintiff's claims are based upon knowledge and factual proof. Public false statements broadcast repeatedly by the defendants' spokesperson in conjunction with 90 consecutive, concentrated trades documented by the time and sales official exchange records conclude the defendants intended to artificially raise the price of three separate ( 30 year bond, 10 year note, and 5 year note ) Treasury futures contracts during July, August, and September 2010 to artificially raise fixed income prices (lower interest rates) to gouge higher fees from fund shareholders. As and for the Complaint, plaintiff alleges as follows:

1

I. SUMMARY OF ALLEGATIONS

1. During July, August, and September 2010 the CEO of Pacific Investment Management Company (hereinafter PIMCO), Mohamad A. El-Erian was a guest many more times than his prior and successive appearances on CNBC and Bloomberg claiming repeatedly there would become a "new normal" price for the 10 year US Treasury notes that he predicted would drop from its normal yield range of between 5.5% to 3.5% during the span of years from 1988 to 2010, to a "new normal" yield of 2.5%. The 2008 stock market panic set off a two month spike that reached 2.5% for a few days.

2. A computer program created to drive the price of US Treasury futures higher that was triggered by a PIMCO bidding surge on a round the clock basis when each time the Dow Jones futures contract dropped by more than 40 points that began in July 2010 and ended in October 2010 made the "new normal" forecast come true. The connection of Treasury prices to declines in the Dow Jones futures was based on a false, but commonly accepted myth that Treasuries are a safe haven when stocks are collapsing.

3. Net inflows into bond funds reached $120 billion year to date at the end of August as investors became more risk averse, Pimco's chief executive and co-chief investment officer said in a radio interview today on "Bloomberg Surveillance" with Tom Keene reported September 10, 2010. "The yield on the benchmark 10-year Treasury note may fall to 2.5% or below," El-Erian said.

4. After the inflated September quarter fee was billed to Pimco shareholders on September 30, 2010, the PIMCO bidding computer program ended and the Treasury prices collapsed until they hit bottom in February 2011 higher than 3.5%, as the constant "new normal" prediction ended abruptly in early October 2010.

On 7/15/2010 the September Treasury bond contract (USU symbol) was 126-08 at 0730.

On 8/25/2010 the USU was 136-28 at 0900, an increase of $10,625 on a $100,000 bond contract.

When the artificial price ended in October 2010, the price collapsed from 135-05 to 117-00 in February 2011 for the March 2011, 30 year Treasury futures contract. The 10 year Note Treasury futures contract dropped from 128-00 to under 119-00.

5. During each of the 90 consecutive intervals (within a 48 trading day span) specified in the plaintiff's audit filed with the CME Group and the CFTC there were huge volumes of contracts purchased all at the offer price executing the worse possible price for PIMCO by PIMCO, forcing prices higher. That generated the highest September quarter fee possible paid by PIMCO fund shareholders to PIMCO management and it made the Defendant's "new normal" prediction come true for a few days.

6. No other bond fund ever goes long Treasury futures. Being long futures in a bond fund adds severe risk to the portfolio. Shorting Treasury futures shifts the risk (hedges) from the fixed income securities in the portfolio and allows the fund manager to be able to reposition bonds in the portfolio at no loss whenever bond prices decline always gaining a higher yield for shareholders. That is the legitimate purpose for using futures contracts.

7. During the intervals of time when the PIMCO rigging program wasn't being implemented there were price dips in all three Treasury contracts. During these dips a small number of short position traders may have made profits. The vast majority of short position traders were forced to take losses when they liquidated their short positions resulting from the artificial prices.

8. All persons and entities that purchased the September 2010 or December 2010 5 year note, 10 year note, and/or 30 year bond futures contracts to liquidate a short position between July 15, 2010 and September 30, 2010 are eligible to be in the class.

3

9.  (That assumes the potential for a securities fraud class action attorney to amend this case after it begins.)

10. All persons who bought Treasury August, September, or October 2010, 5 year note, 10 year note, or 30 year bond puts or sold August, September, or October 2010, 5 year note, 10 year note, or 30 year bond calls would be eligible to be in the potential class.

11. The US Treasury futures and options contract market is traded worldwide around the clock except for the hour break from 1700 to 1800 Eastern time daily and its weekend close from Friday 1700 until Sunday 1800 Eastern time. Members of the potential class losses exceeded $17,000,000,000.

12. Defendants generated enough momentum of prices during the 90 separate times they manipulated the price higher to attract momentum traders to whom the manipulators could dump most if not all their positions until the following trigger began when the Dow Jones futures contract began its next 40 point decline. The enormous size of the single trader bidding prices higher could not be missed by the surveillance of the CME Group.

13. The CME Group claims to be a "Self Reporting Organization" (SRO). The plaintiff provided the precise times for each of the 90 consecutive manipulations by the defendant. Rather than report the gargantuan positions to the CFTC and DOJ, to fulfill and comply with the (SRO) status, the executives of the defendant CME Group claimed the information which they are privileged to know must be hidden at the expense of all other traders on the short side of the Treasury market.

II  BOND FUND CUSTOMER OBJECTIVES

14. The benefits offered to investors by all bond funds are safety of principal and fixed return that is dependable. Being long Treasury futures contracts is extremely risky. There is no

4

difference between the risk of US Treasury futures and the risk of soybean, cattle, silver, oil, or any other commodities futures contracts. There is absolutely no difference from being long US Treasury futures contracts or betting at a casino, betting horses, and betting sporting events. JP Morgan just proved the risk of speculation commonly called "proprietary trading" in May 2012. Hedging eliminates risk by shifting it.

15. The only legitimate purpose for any bond fund to use US Treasury futures is to shift the risk of the potential for higher interest rates with the decline of bond prices. For any bond fund that doesn't shift the risk (hedge) is a complete ignorance by the management of the bond fund. Shifting the risk from a long bond position can only be accomplished by a short futures contract position.

16. The reason that grain elevators always earn profits is they always shift their risk of daily price swings of corn, wheat, soybeans, and other commodities they purchase from farmers. Grain elevators never bet on weather, acreage planted or any other variables that change prices every minute of the trading day by their offset futures contract positions.

17. The fact that PIMCO went long US Treasury futures isolates them as the only potential suspect for the artificial prices they created during July, August, and September 2010. In December 2011 PIMCO settled the civil action 05C 4681 (RG) for manipulating US Treasury futures with a position long $16,000,000,000 (160,000 10 year note contracts). While that is a large position, the size of this case dwarfs that position.

18. The margin necessary to generate the 90 individual trades executed by PIMCO during the 48 day trading period from July 2010 to October 2010 could be managed with $300,000,000. For an institution with more than $1.3 trillion under management, $300,000,000 is no constraint.

19. The PIMCO program operated on a day and night basis. The amount of contracts necessary to move the market higher would vary greatly during the day compared to the middle of the night when trading is very light.

20. The excessive fee PIMCO charged their customers for the September 2010 quarter of approximately $150,000,000 more than paid their settlement of $92,000,000, for the aforementioned 2005 case.

### III     JURISDICTION AND VENUE

20. This Court has jurisdiction over this action pursuant to Sections 1a(4) and 22 of the CEA, 7 U.S.C. ## 25, AND 28 U.S.C. ## 1331 and 1337.

21. Venue is proper in this District pursuant to 15 U.S.C. ## 15(a), pursuant to Section 22 of the CEA, 7 U.S.C. ## 25, and 28 U.S.C. # 1391(b), (c) and (d). The Defendants transacted business in the Southern District of New York, and a substantial part of the events are transacted electronically by computer from any location on the planet. Defendants' unlawful acts manipulated the prices of all three Treasury futures contracts (5 year notes, 10 years notes, and 30 year bonds) which are all traded electronically. The CME Group surveillance of computer trading is performed from its observance of electronic trades created around the clock. There is no physical location required to perform surveillance of customer trades generated by computers from any location. The Southern District of New York is uniquely located in the financial capital of the world.

22. Defendants made use of the means and instrumentalities of interstate commerce with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

23. Plaintiff Stephen Miller is a resident of Bridgeport, Connecticut. Plaintiff Stephen Miller transacted in Treasury futures contracts and options contracts and was injured in his property as a result of Defendants' unlawful conduct.

24. Defendant PIMCO is the largest bond fund and a leading global financial services firm with a prior record of rigging Treasury futures contracts in the 2005 Civil Action 05C 4681 (RG) decided in the UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DISTRICT. PIMCO is incorporated in the state of Delaware and is headquartered at 840 Newport Center Drive, Newport Beach, California 92660.

25. PIMCO Funds is a Massachusetts trust registered open end management investment company consisting of separate portfolios. PIMCO, through Mohamed El-Erian and various other persons, caused PIMCO Funds to combine false statements with 90 specific timed computer bidding to create artificial prices that made the repeated false statements to come true.

26. Mohamed El-Erian acted with Stephen Rodosky and other associates whose identities are unknown to the plaintiff.

27. CME GROUP Inc. (CME) is the commodities exchange that claims to be a Self Reporting Organization (SRO). CME is a Delaware corporation located at 20 South Wacker Drive, Chicago, IL 60606. CME is a defendant in the MF Global bankruptcy in

which CME has protected Jon Corzine at the expense of the MF Global customers. CME is also a defendant in the SOUTHERN DISTRICT OF NEW YORK for its vivid protection of the only possible suspect with motive and access to the missing customer funds of MF Global.

28. Joseph P. Adamczyk, Director, CME Global Head of Enforcement and Kathleen M. Cronin, CME Managing Director, General Counsel both refused to do their job creating a conflict of interest with all Treasury futures and options traders during July, August, and September 2010. Their irresponsible performance is again demonstrated by the Jon Corzine, stealth of customer funds held by MF Global. Their criminal actions are deliberate rather than incompetent.

## IV.   SUBSTANTIVE ALLEGATIONS

29. The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. # 7. A key purpose of the CME rules and amendments is to prevent price manipulation being fair to all traders.

30. The information and knowledge of the exact details of the precise size of each of the 90 successive trading positions of the September and December 2010 five year Treasury Notes, ten year Treasury Notes, and 30 year Treasury Bonds futures contracts bought long and liquidated in a matter of hours during the September 2010 quarter are not exclusively within the possession of PIMCO, they are in the possession of the CME and the CFTC too. That information is neither publicly available nor available to the plaintiff absent discovery.

31. Customers of bond funds are investing their savings in safe securities with modest returns. They don't expect to break the bank gambling on unpredictable, hourly strategies

that trade Treasury futures from the long side. After PIMCO had rigged the entire Treasury market higher with 90 successive trades that exploited the myth that Treasuries are a safe haven, a reasonable expectation by PIMCO would know the bubble they created unilaterally would burst. If PIMCO then hedged its inflated value with a short Treasury futures contract position, they would have protected the inflated value for its own customers they had just ripped off. By not hedging on October 1, 2010 with a short Treasury futures position, the PIMCO fund shares collapsed in synch with the collapse of the Treasury securities and futures prices until February 2011. This collapse occurred in spite of the "Quantitative Easing II" policy (QE2) publicly announced and implemented by the Federal Reserve.

32. The only and exclusive force that determines interest rates in a legitimate free market is inflation. The simple and obvious premise that a 5% return when inflation is 10% is a negative return was proven when Treasury bonds in 1982 traded at 15.5%. Before the misguided policy by the Federal Reserve Chairman Ben Bernanke to rig interest rates with QE2 and to "print" money (a monetary policy that is crazy and unsustainable) there has been a close correlation between Treasury yields and inflation.

33. The myth that any investment including Treasuries can be safe when its prices change from minute to minute is irrational and idiotic on its face. The only safe haven for investors is a bank account or a money fund. Money lost betting on Treasury prices is no different than money lost betting on horses, cards, dice,

34. An actual safe haven would be an investment in Treasury securities if the price risk is completely neutralized with a short Treasuries futures contract. There is no safe strategy when an investment in fixed income securities is coupled with a long position of Treasury

futures contracts. Doping horses to win races is no different than the strategy PIMCO used during July, August, and September 2010 to program massive bidding of Treasury futures that was coupled with the small dips triggered by the Dow Jones futures contracts around the clock even when Dow Jones futures had violent swings separate from no American stock trading.

35. Glaring Wall Street fraud has become common place in America. "No doc loans", "teaser rates" extorting bogus prices from real estate appraisers to enhance mortgage fees, packaging worthless mortgages into securitized packages blessed by the rating agencies AAA designation has been rewarded with annual Wall Street bonuses exceeding $40 billion each year. Not one of the elite universities (Harvard, Yale, Princeton, Columbia, Wharton etc.) has condemned these obvious frauds.

36. Media pundits are focused daily on same sex marriage while the massive Wall Street frauds grab headlines for a day or two. While the media propaganda argues about 8% unemployment there are more than 45,000,000 Americans qualified for food stamps. There are no lessons learned in America, JP Morgan just proved that in May 2012, with a massive loss of deposits by traders located in London. Gambling is called "proprietary trading". The crimes are claimed to be too complicated for anybody to understand. At first the JP Morgan loss was claimed to be $2 billion, a week later the estimate is $5 billion. Only an entire book can report the extent of the financial fraud allowed by government officials who collect bribes from the perpetrators, they call "campaign contributions".

37. A deposition of the PIMCO and CME defendants would reveal the necessary facts for trial.

## THE PIMCO RAP SHEET

38. On September 13, 2004, various PIMCO entities agreed to pay $50,000,000 and consented to cease and desist orders and to undertake reforms of their compliance and corporate governance in order to settle charges that they willfully violated or aided and abetted violation of (a) the antifraud provisions of the Investment Advisors Act of 1940 ("IAA"); (b) Section 17(d) of the Investment Company Act of 1940 ("ICA"); Section 34(b) of the ICA; and (d) Section 204A of the IAA. The SEC Order found that the PIMCO entities willfully violated each of the foregoing laws.

39. On September 15, 2004, various PIMCO entities agreed to pay over $11.6 million and to undertake disclosure and compliance reforms in order to settle SEC charges that they violated (a) Section 206(2) of the IAA and Sections 12(b), 15(c), 17(d), and 34(b) of the ICA. The SEC Order found that PIMCO entities violated the foregoing sections of the law.

40. The aforementioned penalties paid by PIMCO has failed to deter subsequent manipulative acts that resulted in a $92,000,000 cash settlement for Civil Action 05C 4681 in December 2011. To cover that cost PIMCO profited by its September overcharge of approximately $150,000,000 and unknown futures trading used to artificially increase the price (not the value) of its customers share prices which collapsed when the defendants' manipulation in July, August, and September 2010 ended.

41. A written criminal complaint dated August 23, 2010, investigation by the plaintiff to SDNY US Attorney has been ignored in addition to a subsequent criminal complaint dated December 8, 2011, to the District of Connecticut US Attorney and FBI S/A Gary Dagan who claimed to refer the complaint to the SDNY.

42. The DOJ reaction to the Jon Corzine, MF Global criminal acts confirms the pattern of protecting the most spectacular Wall Street crooks even when they receive media attention.

43. Defendants' activities alleged herein created artificial prices of September and December 2010 Treasury futures and options contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. ## 13(a)(1), and (25(a)(1).

44. The plaintiff suffered a loss of $26,880 as a result of defendants' manipulation of the price of the aforementioned Treasury futures and options contracts. All other unnamed parties who lack the experience, knowledge, and sophistication of the plaintiff suffered losses exceeding $17 billion resulting from PIMCO and the cover up by CME. The recent loss by JP Morgan illustrates the lack of experience, knowledge, and sophistication resulting in its gambling called "proprietary trading".

## PRAYER FOR RELIEF

WHEREFORE, plaintiff's pray for relief as follows:

(A)   That plaintiff is allowed to recover actual damages in addition to punitive monetary sanctions and a criminal investigation leading to criminal sentencing by this court of law.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable.

Dated:     May 20, 2012              Respectfully Submitted,

*Stephen A. Miller*

By Stephen A. Miller, pro se
83 Waldorf Avenue
Bridgeport, CT 06605
Telephone: 203-923-1680

13