**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
STEPHEN A. MILLER,                   :

                                 :

                      Plaintiff,       :  Case No. 12-CV-4122 (LTS) (JCF)

        v.                       :

                                 : ECF CASE

PACIFIC INVESTMENT MANAGEMENT   : ELECTRONICALLY FILED
COMPANY LLC, et al.,             :

                                 :

                  Defendant.    :
---------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## PACIFIC INVESTMENT MANAGEMENT COMPANY LLC'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>


Dated:  December 10, 2012


                           BOIES, SCHILLER & FLEXNER LLP

                           Robert B. Silver
                           Jason C. Cyrulnik
                           333 Main Street
                           Armonk, NY 10504
                           Tel:  914.749.8200

                           *Attorneys for Defendant Pacific Investment*
                           *Management Company LLC*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 4

ARGUMENT ............................................................................................................. 8

I.      APPLICABLE PLEADING STANDARDS. ......................................................... 8

         A.  Failure to State a Claim Upon Which Relief May Be Granted – Rule 12(b)(6). .................................................... 8

         B.  Miller's Market Manipulation Claim Is Subject to Rule 9(b)'s Heighted Pleading Standards. ................................. 8

         C.  Lack of Subject Matter Jurisdiction – Rule 12(b)(1). ......................... 9

         D.  Miller's *Pro Se* Status Does Not Excuse His Failure to Adequately Plead a Cause of Action and Affirmatively Establish Subject-Matter Jurisdiction. ............................................... 10

II.     MILLER FAILS TO PLEAD "FACIALLY PLAUSIBLE" FACTS SUFFICIENT TO ALLEGE EACH OF THE ELEMENTS OF A MARKET MANIPULATION CLAIM UNDER THE CEA ............................... 10

         A.  Miller Does Not Allege the Existence of an Artificial Price. ............ 11

         B.  The Complaint Does Not Allege a Rational Basis for Inferring That PIMCO Intended to Manipulate the Treasury Futures Market. 12

         C.  Miller's Speculative and Fanciful Allegations that PIMCO Caused an Artificial Price Are Implausible at Best. .......................... 14

         D.  Miller's Claim That PIMCO Had an Ability to Influence the Treasury Market Is Implausible on its Face. .................................... 15

         E.  The Complaint Fails to Allege Market Manipulation with Particularity ................................................................................. 16

III.    MILLER LACKS STANDING TO ASSERT HIS CLAIM ................................. 17

IV.    MILLER'S CLAIM IS "FRIVOLOUS" AND SHOULD BE DISMISSED WITHOUT A RIGHT TO APPEAL PURSUANT TO 28 U.S.C. § 1915. .......... 19

CONCLUSION ......................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................... 8, 11

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................... 8

*Bridgewater v. Taylor*,
   745 F. Supp. 2d 355 (S.D.N.Y. 2010) ........................................................... 15

*Cargill, Inc. v. Hardin*,
   452 F.2d 1154 (8th Cir. 1971) ....................................................................... 15

*Collins v. Banks*,
   No. 07-CV-458S(F), 2007 WL 3124531 (W.D.N.Y. Oct. 22, 2007) ........................... 20

*Conomos v. Chase Manhattan Corp.*,
   No. 97 CIV 0909 (PKL), 1998 WL 118154 (S.D.N.Y. 1998)...................................... 15

*Duhart v. Carlson*,
   469 F.2d 471 (10th Cir. 1972) ....................................................................... 22

*Gallop v. Cheney*,
   642 F.3d 364 (2d Cir. 2011) ........................................................................... 20

*Goonewardena v. New York State Workers' Comp. Bd.*,
   No. 09 Civ. 8244 (LTS), 2011 WL 4822553 (S.D.N.Y. Oct. 5, 2011) ................. 10, 18

*Harris v. Mills*,
   572 F.3d 66 (2d Cir. 2009) ............................................................................. 10

*In re Amaranth Natural Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008) ...................................................... 8, 13

*In re Crude Oil Commodity Litig.*,
   06 CIV. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007)........... 9, 11, 16, 17

*In re DiPlacido*,
   CFTC No. 01-23, 2008 WL 4831204 (C.F.T.C. Nov. 5, 2008) .................................. 11

*In re Direxion Shares ETF Trust*,
   279 F.R.D. 221 (S.D.N.Y. 2012) .................................................................... 18

*In re Energy Transfer Partners Nat. Gas. Litig.*,
   No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. 2009).............................................. 12

*In re Soybean Futures Litig.*,
  892 F. Supp. 1025 (N.D. Ill. 1995) ................................................................. 11, 12, 14

*Jones v. Capital Cities/ABC Inc.*,
  168 F.R.D. 477 (S.D.N.Y. 1996) ...................................................................... 15

*Jones v. City of New York*,
  Nos. Civ.A. 99-8281, Civ.A. CV-00-370DGT, 2000 WL 516889
  (E.D.N.Y. Mar. 15, 2000) ................................................................................. 25

*Keane v. Keane*,
  08 CIV. 10375 (WCC), 2009 WL 1490686 (S.D.N.Y. May 27, 2009) ........................ 10

*Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*,
  464 F.3d 255 (2d Cir. 2006) ............................................................................. 19

*Kohen et al. v. PIMCO et al.*,
  No. 05-CV-4681 (N.D. Ill. 2005) .................................................................. 7, 14

*Lewis v. Casey*,
  518 U.S. 343 (1996) ........................................................................................ 18

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) .......................................................................... 20

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................ 17

*Madonna v. United States*,
  878 F.2d 62 (2d Cir. 1989) .............................................................................. 16

*McDermott v. New York Metro LLC*,
  664 F. Supp. 2d 294 (S.D.N.Y. 2009) ................................................................ 9

*McIlroy v. Dittmer*,
  732 F.2d 98 (8th Cir. 1984) ............................................................................. 13

*Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  669 F. Supp. 1244 (S.D.N.Y. 1987) .................................................................. 18

*Neitzke v. Williams*,
  490 U.S. 319 (1989) .................................................................................... 19, 20

*O'Neil v. Ponzi*,
  394 Fed. Appx. 795 (2d Cir. 2010) .................................................................. 20

*Riches v. Buffett*,
  No. 8:07CV388, 2007 WL 5659028 (D. Neb. Nov. 8, 2007) ...................................... 22

iii

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .......................................................................... 9

*State Employees Bargaining Agent Coal. v. Rowland*,
    494 F.3d 71 (2d Cir. 2007) ........................................................................ 10

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009).................................................................................... 17

*Volkart Bros., Inc. v. Freeman*,
    311 F.2d 52 (5th Cir. 1962) ...................................................................... 12

*Wade v. New York*,
    No. 11 Civ. 1073 (LTS), 2011 WL 5075100 (S.D.N.Y. Oct. 25, 2011) ...................... 10

## Other Authorities

18 U.S.C. § 1951 .................................................................................................. 22

18 U.S.C. § 875 .................................................................................................... 22

28 U.S.C. § 1915 ..................................................................................... 1, 4, 19, 25

31 C.F.R. § 356 .............................................................................................. 5, 15

7 U.S.C. § 13 ................................................................................................. 2, 18

7 U.S.C. § 25 ................................................................................................. 2, 19

Evan Gatev & Philip Strahan, *Banks' Advantage in Hedging
    Liquidity Risk: Theory and Evidence from the Commercial Paper Market*,
    61 Journal of Finance 867 (2006) ................................................................. 5

Fed. R. Civ. P. 12 .................................................................................... passim

Fed. R. Civ. P. 8 ............................................................................................. 1, 8

Fed. R. Civ. P. 9 ....................................................................................... 1, 3, 8, 9

Francis A. Longstaff, *The Flight-To-Liquidity Premium in
    U.S. Treasury Bond Prices*, 77 Journal of Business 511 (2004) ................... 5

Peter Hordahl & Michael R. King, *Developments in Repo
    Markets during the Financial Turmoil*, BIS Quarterly Review (2008).......... 5

Pursuant to Rules 8(a), 9(b), 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 1915(e)(2)(B)(i) and (ii), Defendant Pacific Investment Management Company LLC ("PIMCO") respectfully submits this memorandum of law in support of its motion to dismiss the complaint filed by the plaintiff, Stephen A. Miller.

## PRELIMINARY STATEMENT

As best can be discerned from the Complaint, the plaintiff, Stephen A. Miller, is an investor who does not believe in what he terms the "commonly accepted" market belief that Treasury prices rise when stock prices fall. When that market expectation proved accurate in 2010, as stock prices declined and Treasury prices increased, Miller concluded that some force must have illegally manipulated the market to make it *artificially* behave in precisely the way the market expected. Although his Complaint is unclear, Miller presumably lost money on unspecified investments he made betting against this conventional wisdom, and through this lawsuit Miller seeks, based on blind speculation and conjecture, to hold PIMCO responsible for his own failure to outsmart the market.

The manner by which Miller set his sights on PIMCO as the party responsible for his losses is equally bewildering. Miller claims to have identified ninety substantial Treasury futures trades made during 2010 and surmised that they were all made by a single trader. He then hypothesized that the trader must have been PIMCO because of its significant resources and because its CEO had publicly predicted that Treasury futures would rise during 2010. From this conjecture, Miller arrived at the extraordinary conclusion that PIMCO must have used an unidentified computer program to manipulate the entire Treasury futures and options market. These allegations are at best a baseless attempt by a losing commodities trader to blame somebody else for the market's failure to conform to his personal (albeit

misguided) expectations, and at worst the invention of an individual with an unfortunate, documented history of mental illness involving commodities-market conspiracy theories.

Miller presents himself as a crusader against market corruption, and before initiating this lawsuit, he presented his accusations to a subsidiary of the CME Group, Inc. (the "CME"), and to multiple federal agencies and prosecutors.  Each of them declined to take action against PIMCO.  Miller then commenced this lawsuit against PIMCO and PIMCO Funds (*i.e.*, a series of mutual funds for which PIMCO is the investment adviser); he also sued the CME and several of its employees, claiming that they "covered up" PIMCO's purported scheme by refusing to act on his unsupported accusations.  But Miller now confesses that for him this lawsuit is a fact-finding mission, in which he proclaims his intent to use the discovery process to search for facts he believes will prove unlawful market manipulation.  This approach of course is precisely the type of abuse of process that the law prohibits.

**Summary of Dismissal Grounds**

Miller purports to state a private cause of action against PIMCO for market manipulation in violation of Sections 9(a) and 22(a) of the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 13, 25.  His claim fails for multiple independent reasons.

For starters, Miller fails to plead facially plausible facts sufficient to allege *any* of the four required elements of a claim for market manipulation under the CEA, let alone all of them.  *First*, far from alleging the existence of an artificial price, the Complaint alleges the opposite:  that the Treasury futures market behaved precisely as would be expected under ordinary market conditions.  (*See* Part II.A, below.)  *Second*, Miller does not allege a plausible basis for inferring that PIMCO specifically intended to manipulate the Treasury

market.  (*See* Part II.B, below.)  Again, to the contrary, the Complaint itself concedes that the alleged scheme makes very little sense because PIMCO did not behave like a manipulator – that is, PIMCO did *not* take a short position in Treasury futures before their expected collapse and thus PIMCO Fund shares *collapsed* along with the rest of the market. *Third*, Miller fails adequately to allege that PIMCO caused the purportedly artificial price, basing his claim entirely on a speculative, fanciful allegation that PIMCO used an unidentified computer program to cause an artificial price, about which Miller concedes he can plead no facts.  (*See* Part II.C, below.)  *Fourth*, apart from general allegations about PIMCO's size, the Complaint does not include any plausible factual allegations demonstrating that PIMCO was even capable of influencing a market with over $500 billion dollars of *daily* trading volume, another required element under the CEA.  (*See* Part II.D, below.)

Even if Miller had pleaded facts sufficient to satisfy Rule 8's pleading requirements with respect to each of the required elements (he does not), the Complaint still falls far short of the specificity required by Rule 9(b)'s applicable pleading standards.  (*See* Part II.E, below.)  Although courts afford latitude to *pro se* litigants and their pleadings, they are decidedly *not* exempt from Rule 9(b), and regardless, no amount of leniency can remedy the multiple, fatal deficiencies in Miller's Complaint.

Miller also fails to plead the existence of Article III standing to pursue his claim. (*See* Part III, below.)  Miller alleges that PIMCO charged PIMCO Funds shareholders excessive management fees based on Treasury prices inflated through the alleged market manipulation, but he does not even allege that he was a PIMCO Funds shareholder.  To the extent he relies on a general claim that he suffered unspecified "losses" trading in the

Treasury market, Miller does not plead any factual basis upon which to conclude that his losses had anything to do with the alleged manipulation.  For similar reasons, Miller also lacks standing under the CEA to assert a private cause of action for market manipulation.  Miller's apparent purpose in filing this lawsuit is to act as a one-man enforcement agency, but he does not have standing to do so.

Finally, Miller's claim should be dismissed with prejudice under 28 U.S.C. § 1915, which requires that factually frivolous or delusional claims proceeding *in forma pauperis* be dismissed with prejudice.  (*See* Part IV, below.)  The fantastical story set forth in the Complaint lacks any basis in fact or reason, often going well beyond the merely implausible to the point of delusional.  Miller has an unfortunate history of delusional beliefs in commodities market manipulation conspiracies that he alone purports to uncover, and he has been found mentally incompetent in connection with those theories.  This Court has the power and responsibility to dispose of frivolous or delusional claims, and it is permitted to consider factors such as judicial records of relevant mental illness in reaching that conclusion.

Accordingly, Miller's claim should be dismissed with prejudice, and the Court should certify that no appeal from such dismissal would be in good faith.  Neither the federal court system nor the Defendants should be forced to waste any further resources on Miller's frivolous claim.

## **BACKGROUND**

PIMCO is an investment adviser registered with the U.S. Securities and Exchange Commission ("SEC").  PIMCO manages investments on behalf of, among others, mutual funds, pension plans, and employee benefit plans, including retirement funds for policemen, firefighters, and teachers.  PIMCO is also a commodity pool operator and commodity

trading advisor registered with the Commodity Futures Trading Commission ("CFTC"), and is a member of the National Futures Association.  As such, PIMCO is subject to extensive regulatory oversight.

PIMCO is an active trader in the commodities markets, on which many types of commodities are traded, including Treasury futures contracts.  The Treasury market is the largest and most liquid market in the world, with an average of $582.7 billion in *daily* trading volume during 2011.  (Securities Industry and Financial Markets Association, US Treasury Trading Volume (updated November 8, 2012), *available at* http://www.sifma.org /research/statistics.aspx; *cf.* Department of the Treasury Circular, Public Debt Series no. 1– 93, 31 C.F.R. § 356 appx. C ("The Treasury securities market is the largest and most liquid securities market in the world.").)  Miller acknowledges, as he must, that it is a "commonly accepted" belief among market participants that Treasuries are a safe haven when stock prices are on the decline, which typically causes Treasury prices to rise when stock prices decline.  (Compl. ¶ 2; *see, e.g.*, Peter Hordahl & Michael R. King, *Developments in Repo Markets during the Financial Turmoil*, BIS Quarterly Review (2008) (describing commonly accepted belief among market participants that Treasuries are a safe haven for investors); Francis A. Longstaff, *The Flight-To-Liquidity Premium in U.S. Treasury Bond Prices*, 77 Journal of Business 511 (2004) (same); Evan Gatev & Philip Strahan, *Banks' Advantage in Hedging Liquidity Risk: Theory and Evidence from the Commercial Paper Market*, 61 Journal of Finance 867 (2006) (same).)

Miller claims generally to have transacted in Treasury futures contracts and options contracts and to have suffered $26,880 in trading losses, although the Complaint is silent as to even the most basic details of these transactions – including which products he traded,

how those transactions were effected, or when the trading occurred.  (Compl. ¶ 44.)  The
Complaint alleges that in the wake of his unsuccessful trades, Miller performed his own
"audit" of the publicly available trading data to determine why Treasury prices had moved
inverse to stock prices – that is, he sought to determine why the market behaved in
accordance with the "commonly accepted" expectation of most investors and the market.
(*Id.* ¶¶ 2, 5, 12.)  It appears that Miller assumed the existence of market manipulation from
the start, and he set out to determine who had made it *appear* as though the market was
behaving in the commonly accepted manner.  Miller's sights landed on PIMCO.

      Miller filed this lawsuit *pro se* and *in forma pauperis*, alleging that PIMCO used an
unidentified 24-hour computer program to create a manipulative bidding surge for Treasury
futures every time the price for Dow Jones future contracts dropped more than 40 points.
(*Id.* ¶¶ 2, 4-5, 12.)  Miller claims that this computer program was operational from July 2010
until early October 2010, during which time it allegedly made ninety unspecified trades over
the course of forty-eight trading days that "rigged the entire Treasury market higher."  (*Id.*
¶ 31.)  According to Miller, the program forced prices of 5-year, 10-year and 30-year
Treasury futures and options contracts higher "for a few days," until the program ceased to
operate in October 2010, at which point Treasury prices collapsed.  (*Id.* ¶¶ 5, 8, 10.)  Miller
alleges that PIMCO did not short Treasury futures before their collapse even though,
according to Miller's allegations, PIMCO expected the collapse to occur when "the bubble
they created unilaterally would burst" with the cessation of the unidentified computer
trading program, and that PIMCO Fund shares thus "collapsed" along with Treasury prices
in the latter part of 2010.  (*Id.* ¶ 31.)  Nevertheless, Miller hypothesizes that PIMCO was
responsible for the temporary rise in prices and that it must have intended to profit from

temporarily inflated management fees charged to PIMCO Funds shareholders for the third quarter of 2010.  (*Id.* ¶ 5.)  According to Miller, the motive for this short-lived scheme was to use the inflated September 2010 PIMCO Funds shareholder fees *the following year* to pay for a settlement resolving an unrelated class-action lawsuit filed in 2005.[1]  (*Id.* ¶ 20.)

The Complaint sets forth no factual basis for these allegations, and indeed concedes as much.  Miller acknowledges that information concerning the details of the ninety trades PIMCO allegedly used to manipulate the market are unknown to him.  (*Id.* ¶ 30.)  Miller does not even allege any basis for knowing that the trades he claims to have identified were all made by the same party, let alone that they were all made by PIMCO specifically.

The Complaint posits three bases for Miller's conclusion that PIMCO must have been responsible for the allegedly manipulative trades.  *First*, Miller points to several media interviews PIMCO's CEO allegedly gave during 2010 in which he predicted that the yield for a 10-year Treasury note would drop to a "new normal" of 2.5 percent.  (*Id.* ¶¶ 1, 3.)  Miller alleges that a goal of the market manipulation scheme was to make this prediction come true.  (*Id.* ¶ 2.)  *Second*, Miller alleges that in unrelated litigation from 2005, PIMCO was alleged to have taken a long position in Treasury futures, and therefore "[t]he fact that PIMCO went long US Treasury futures isolates them as the only potential suspect for the artificial process they created during July, August, and September 2010."  (*Id.* ¶ 17.)  *Third*, citing the size of PIMCO's assets under management, Miller summarily concludes that PIMCO had the ability to accomplish the alleged market manipulation scheme.  (*Id.* ¶ 18.) This constitutes the universe of information from which Miller has deduced all of the other

---

[1]	The settlement of that litigation did not occur until January 2011 and was not approved until May 2011.  (*Kohen v. PIMCO*, No. 05-CV-4681 (N.D. Ill. 2005) Dkt. Nos. 557, 572.)

allegations in the Complaint:  the unidentified computer program, the manipulative trades, the fee overcharge and the plan to pay for the future settlement of an unrelated lawsuit.[2]

## ARGUMENT

### I.       APPLICABLE PLEADING STANDARDS.

#### A.       Failure to State a Claim Upon Which Relief May Be Granted – Rule 12(b)(6).

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A pleading that consists of "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 678. Furthermore, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  (*See* Parts II.A-D, below.)

#### B.       Miller's Market Manipulation Claim Is Subject to Rule 9(b)'s Heighted Pleading Standards.

A complaint that alleges market manipulation must satisfy the heightened pleading standards of Rule 9(b), which requires that the facts be pleaded "with particularity."  *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 528-29 (S.D.N.Y. 2008) ("a plaintiff alleging manipulation must plead with particularity the nature, purpose, and

---

[2]       Miller also asserted claims against CME Group, Inc., Kathleen Cronin and Joseph Adamczyk (the "CME Group Defendants") for allegedly covering up the purported market manipulation.  (*E.g.*, Compl. ¶¶ 12, 44.)  Like PIMCO, the CME Group Defendants moved to dismiss those claims in a separate motion to dismiss, filed October 4, 2012.  (Dkt. No. 2.)

effect of the fraudulent conduct and the roles of the defendants.") (quotations omitted).
Because Miller's claim is premised on averments of fraud, Rule 9(b) is particularly
applicable, regardless of whether proof of fraud is an essential element of his legal cause of
action. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b)
applies to 'all averments of fraud.'  This wording is cast in terms of the conduct alleged, and
is not limited to allegations styled or denominated as fraud or expressed in terms of the
constituent elements of a fraud cause of action."); *In re Crude Oil Commodity Litig.*, 06 CIV.
6677 (NRB), 2007 WL 1946553, at *4-*5 (S.D.N.Y. June 28, 2007) (applying *Rombach* to a
market manipulation claim under the CEA).

The heightened pleading standard is designed "to safeguard a defendant's reputation
from improvident charges of wrongdoing," which consideration applies with equal force
regardless of the cause of action in which they appear. *Id.*  Miller's market manipulation
claim alleges that PIMCO intentionally "rigged the entire Treasury market" (Compl. ¶ 31) in
a scheme to charge PIMCO Funds shareholders "excessive fee[s]" (*id.* ¶ 20), for which
Miller asks the Court to initiate a "criminal investigation leading to criminal sentencing" (*id.*
at 12).  These allegations are plainly "averments of fraud" and, as such, Rule 9(b) requires
that they be supported by facts pleaded with particularity.  (*See* Part II.E, below.)

## C.      Lack of Subject Matter Jurisdiction – Rule 12(b)(1).

A motion to dismiss for lack of Article III standing implicates a lack of federal
subject-matter jurisdiction, and thus is brought pursuant to Rule 12(b)(1).  *McDermott v.
New York Metro LLC*, 664 F. Supp. 2d 294, 298 (S.D.N.Y. 2009); Fed. R. Civ. P. 12(b)(1).
In contrast to a motion to dismiss for failure to state a claim under Rule 12(b)(6), "in
adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court may
resolve disputed factual issues by reference to evidence outside the pleadings." *State*

9

*Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 (2d Cir. 2007) (citations omitted).  (*See* Part III, below.)

> ### D. Miller's *Pro Se* Status Does Not Excuse His Failure to Adequately Plead a Cause of Action and Affirmatively Establish Subject-Matter Jurisdiction.

Each of the foregoing requirements applies to *pro se* complaints.  A *pro se* plaintiff must affirmatively show the existence of subject-matter jurisdiction by pleading sufficient plausible facts, "and that showing is *not* made by drawing from the pleadings inferences favorable to the party asserting it."  *Goonewardena v. New York State Workers' Comp. Bd.*, No. 09 Civ. 8244 (LTS), 2011 WL 4822553, at *2 (S.D.N.Y. Oct. 5, 2011) (emphasis added).  With respect to Rule 12(b)(6), although courts tend to afford liberal construction to *pro se* complaints, the allegations set forth in *pro se* complaints must still be dismissed where they are not supported by plausible facts.  *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009); *Wade v. New York*, No. 11 Civ. 1073 (LTS), 2011 WL 5075100, at *1 (S.D.N.Y. Oct. 25, 2011) (noting that *pro se* pleadings "must still contain factual allegations that raise a right to relief above the speculative level").  Finally, *pro se* complaints alleging fraud must satisfy the heightened pleading standards of Rule 9(b):  "While pleadings prepared by *pro se* litigants such as plaintiff are generally held to less stringent standards than formal pleadings drafted by lawyers, they are still subject to dismissal where the pleadings fail to comply with Rule 9(b)."  *Keane v. Keane*, 08 CIV. 10375 (WCC), 2009 WL 1490686, at *5 (S.D.N.Y. May 27, 2009) (collecting cases).

## II. MILLER FAILS TO PLEAD "FACIALLY PLAUSIBLE" FACTS SUFFICIENT TO ALLEGE EACH OF THE ELEMENTS OF A MARKET MANIPULATION CLAIM UNDER THE CEA.

To state a market manipulation claim under the CEA, Miller must plead facially plausible facts sufficient to allege that (1) PIMCO had an ability to influence the market,

(2) an artificial price existed in the Treasury market, (3) PIMCO caused the artificial price, and (4) PIMCO specifically intended to cause the artificial price. *See In re Crude Oil Commodity Litig.*, 06 CIV 6677 (NRB), 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007). Miller has failed under any pleading standard sufficiently to allege *any* of the required elements of such a claim, let alone all of them.

### A.   Miller Does Not Allege the Existence of an Artificial Price.

To allege the existence of an artificial price, the Complaint must allege that Treasury futures contracts were selling at "a price which does not reflect basic forces of supply and demand." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995). A "statistically unusual high (or low) price will not on that basis alone be deemed artificial." *In re DiPlacido*, CFTC No. 01-23, 2008 WL 4831204, at *87 (C.F.T.C. Nov. 5, 2008). Miller's Complaint alleges the *opposite* of an artificial price:  Acknowledging the widely accepted trading strategy that Treasuries are a safe haven when the stock market declines, Miller alleges only that the market reflected those basic forces of supply and demand. (Compl. ¶ 31.)  The law considers such pricing to be natural, not artificial.[3]

In fact, Miller does not even appear to claim that Treasury futures and option prices deviated from their market price during the relevant period, but instead that the market price *itself* was incorrect.  This position was clarified in his recent filing, "Plaintiff's Memorandum of Facts Concerning Absolute Immunity and Bad Faith," in which Miller claims:

---

[3]    Moreover, in concluding the existence of deliberate market manipulation, Miller overlooks the far more plausible explanation for the coincidence of large, long-side trades in Treasury futures while the stock market was declining – *i.e.*, these trades *followed* a well-established investing trend and did not "rig" the entire Treasury futures market.  As between the "obvious alternative explanation" for the alleged Treasury market trades and the market manipulation scheme Miller asks the Court to infer, market manipulation is not a plausible conclusion. *See Iqbal*, 556 U.S. at 682.

> To claim treasury securities are a safe haven when the price of treasury securities changes every minute as violently as any commodity is psychotic.  It's beyond stupid . . . .  Nobody in their right mind would believe such nonsense *but the fact that nobody else contests this absurd myth proves there is a deep trance controlling the American people.*

(Plaintiff's Mem. of Facts at 4, filed October 24, 2012 (Dkt. No. 30) (emphasis added).)  At bottom, Miller's claim is that he (alone) – and not the market – understands what the market price *should* be.  That unique knowledge, even if accurate, does not allege the existence of an "artificial price" upon which a market manipulation claim may be based.  *In re Soybean Futures Litig.*, 892 F. Supp. at 1044.

### B.   The Complaint Does Not Allege a Rational Basis for Inferring That PIMCO Intended to Manipulate the Treasury Futures Market.

The Complaint also fails to state a plausible basis for inferring that PIMCO specifically intended to manipulate the Treasury futures market.  The law is clear that to state a market manipulation claim, the alleged manipulative conduct must have been "calculated to produce a price distortion."  *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58-59 (5th Cir. 1962); *see also In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1058 (N.D. Ill. 1995) (plaintiff must show that defendant acted with the purpose or conscious object of causing an artificial price).  Miller thus must plead facts showing that the intended objective of PIMCO's trades was to generate an artificial price; it is *not* sufficient to show that PIMCO merely knew that particular consequences would probably or necessarily follow from its action.  *See In re Energy Transfer Partners Nat. Gas. Litig.*, No. 4:07-cv-3349, 2009 WL 2633781, *6 (S.D. Tex. 2009) (distinguishing "specific intent" from "general intent" and holding that mere knowledge that a trade will generate a particular result does not satisfy the requirement of "specific intent").  Thus, if a trader with a long position predicts and waits for the best price at which to sell, or trades in the direction the trader

believes the market is headed, it can unavoidably contribute to or accelerate the market's

movement towards that price, particularly if other longs trade the same way, but that does

*not* establish specific intent.  *See id.; In re Amaranth Nat. Gas. Litig.*, 587 F. Supp. 2d 513,

534-35 (S.D.N.Y. 2008) ("If a trading pattern is supported by a legitimate economic

rationale, it cannot be the basis for liability under the CEA.").  The specific-intent

requirement also means that Miller cannot establish liability by showing that, in retrospect,

PIMCO's views about the market were wrong, or as he alleges, based on a "myth" (Compl.

¶ 2).  *McIlroy v. Dittmer*, 732 F.2d. 98, 103 (8th Cir. 1984).

        Rather than allege specific intent, the Complaint itself alleges that PIMCO did not

even short Treasury futures at the allegedly inflated price prior to their collapse even though,

according to Miller, PIMCO expected the collapse to occur when the "bubble they created

unilaterally would burst" with the cessation of the unidentified computer trading program.

Instead the Complaint alleges that PIMCO maintained its long position in Treasury futures,

and "the PIMCO fund shares collapsed in sync with the collapse of Treasury securities and

future prices."  (*See* Compl.¶ 31.)  Naturally, no investment adviser would purposefully set

up a fund it manages for a "collapse" of its shares, and Miller's allegations to the contrary

are implausible on their face.  A collapse in the value of the PIMCO Funds' assets under

management as alleged in the Complaint would trigger a potential rise in shareholder

redemptions, while prospective investors would be deterred from becoming new

shareholders.  Moreover, a collapse in share price could lower future management fees,

further undermining the purported economic motivation for the alleged market manipulation.

        Rather than abandon his baseless conspiracy theory in the face of these facts, Miller

speculates that PIMCO must have had a different purpose in allegedly manipulating the

Treasury market – to *temporarily* charge PIMCO Funds shareholders higher fees based on inflated Treasury prices.  He further surmises that PIMCO's purpose in overcharging PIMCO Funds shareholders in the third quarter of 2010 was to pay for a settlement resolving litigation having nothing to do with Miller's claim the year *after* the alleged market manipulation scheme took place.  (*Id.* ¶ 40.; *Kohen v. PIMCO*, No. 05-CV-4681 (N.D. Ill. 2005) Dkt. Nos 557, 572.)  Miller's allegations concerning PIMCO's vast resources (Compl. ¶ 18) directly conflict with his theory that PIMCO needed to somehow manufacture liquidity to pay the relatively modest settlement amounts.  At bottom, the motive Miller seeks to attribute to PIMCO is simply not plausible.

### C.   Miller's Speculative and Fanciful Allegations that PIMCO Caused an Artificial Price Are Implausible at Best.

Even if Miller had properly alleged that prices were artificial, the Complaint does not plausibly allege that PIMCO caused an artificial price.  *See In re Soybean*, 892 F. Supp. at 1045 (to sustain a claim for manipulation, a plaintiff must show that the defendant "caused" an artificial price).  According to Miller, during 2010, PIMCO operated an unidentified "computer program created to drive the price of US Treasury futures higher."  (Compl. ¶¶ 1-2.)  Also according to Miller, this computer program made ninety trades in favor of Treasury futures over the course of forty-eight trading days.  (*Id.* ¶ 31.)  But Miller has no factual basis for knowing about any alleged PIMCO computer program, nor does he have any basis for claiming that PIMCO actually made any of the trades on which his claim is predicated.  Indeed, Miller concedes that he has no factual basis for these allegations, as the facts necessary to support his claim are "neither publicly available nor available to the plaintiff absent discovery."  (*Id.* ¶ 30; *see also id.* ¶ 17 ("A deposition of the PIMCO and CME defendants would reveal the necessary facts for trial").)  Miller's recent "Motion Requesting

the Court to Examine Defendant's Large Trader Reports to the CFTC" (Dkt. No. 32) similarly seeks to cure the fatal deficiencies of his complaint by asking the Court to conduct its own factual investigation or to order discovery in order to determine if any such claim exists.  Miller's wild conspiracy theories do not satisfy the well-accepted rule that "a litigant has to state a claim before he or she is entitled to discovery."  *Bridgewater v. Taylor*, 745 F. Supp. 2d 355, 358 (S.D.N.Y. 2010); *see also Conomos v. Chase Manhattan Corp.*, No. 97 CIV 0909 (PKL), 1998 WL 118154, *3 (S.D.N.Y. 1998) (rejecting plaintiff's request for discovery in response to a motion to dismiss and stating, "[i]n essence, [plaintiff] claims that he cannot make any factual allegations because he does not know any of the facts.  Litigants previously have used this argument without success."); *Jones v. Capital Cities/ABC Inc.*, 168 F.R.D. 477, 480 (S.D.N.Y. 1996) ("[T]he purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists.").

### D.   Miller's Claim That PIMCO Had an Ability to Influence the Treasury Market Is Implausible on its Face.

Miller does not even plausibly allege that PIMCO had the ability to manipulate the Treasury market – arguably the largest and most liquid market in the world.   Department of the Treasury Circular, Public Debt Series no. 1–93, 31 C.F.R. § 356 appx. C ("The Treasury securities market is the largest and most liquid securities market in the world.").  A defendant has the ability to manipulate futures prices only where it both:  (1) "acquires contracts substantially in excess of the deliverable supply" and (2) "has substantial control of the major portion of the contracts."  *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1162 (8th Cir. 1971).  Miller does not allege either of these circumstances.  Instead, the Complaint merely alleges, in conclusory fashion, that "PIMCO rigged the entire Treasury market higher with 90 successive trades," but provides *no* details about these trades from which the Court could

plausibly infer that PIMCO was capable of accomplishing the extraordinary feat alleged. (Compl. ¶ 31.)  Miller postulates that the trades that he claims rigged the market "could be managed with $300 million," which he argues "[f]or an institution with more than $1.3 trillion under management . . . is no constraint." (*Id.* ¶ 18.)  However, the Complaint fails to plead any facts showing that a $300 million trading position – approximately one-twentieth of one percent (0.05%) of the overall Treasury market's daily trading volume – could have even a marginal effect on the Treasury market, much less entirely "rig" it.  Moreover, Miller does not actually allege that such funds were used; he merely speculates that such a sum would have been sufficient to execute the trades he declines to identify or describe.

### E.      The Complaint Fails to Allege Market Manipulation with Particularity.

"To meet the requirements of Rule 9(b) in the context of a market manipulation claim, the plaintiff must specify 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *In re Crude Oil Commodity Litig.*, 06 CIV. 6677 (NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) (quoting *In re Natural Gas*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005)).  These pleading requirements serve an "important purpose . . . which is 'to discourage the filing of complaints as a pretext for discovery of unknown wrongs.'" *Id.* at *7 (quoting *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989)).  Miller all but concedes that his aim is to obtain impermissible exploratory discovery (Compl. ¶¶ 17, 30), but the Second Circuit has rejected that approach and held that a plaintiff's "contention, that discovery will unearth information tending to prove his contention of fraud, is precisely what Rule 9(b) attempts to discourage." *Madonna*, 878 F.2d at 66.

The Complaint falls far short of meeting Rule 9(b)'s particularity requirement as applied to market manipulation claims.  As discussed above, Miller pleads no facts from which his allegations of "manipulative acts" plausibly may be inferred.  (*See* Part II.C, above.)  Dismissal of a market manipulation claim is proper when "[t]he actions allegedly taken by defendants that caused the artificial prices in the [allegedly manipulated] market are described in a wholly speculative and conclusory manner in the complaint."  *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *6.  Additionally, the Complaint is replete with impermissible "lumping" of the Defendants without "specifically alleg[ing] the fraud perpetrated by each defendant."  *Id.*

## III.    MILLER LACKS STANDING TO ASSERT HIS CLAIM.

In addition to the numerous fatal defects in Miller's market manipulation claim discussed above, as a threshold matter, Miller does not satisfy the "irreducible constitutional minimum of standing" required by Article III of the U.S. Constitution, and his claim is therefore subject to dismissal pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  As the plaintiff, Miller bears the burden of showing that he "has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  To do so, he must plead facially plausible facts showing that:  (1) he suffered an injury-in-fact to a "legally protected interest" that is "not conjectural or hypothetical;" (2) there is a causal connection between the injury and the conduct at issue; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.  Miller's claim should be dismissed for failing to meet this "irreducible" requirement.

Miller alleges that PIMCO charged PIMCO Funds shareholders excessive fees based on inflated Treasury prices.  However, Miller does not claim to have been a PIMCO Funds shareholder during the relevant period and thus he does not have a "legally protected interest" in redressing this purported injury to others.  To the extent Miller intends to claim he was harmed as a short seller in the Treasury futures market – although no short sales are alleged in the Complaint – Miller still lacks standing because he does not allege how or when he incurred any trading losses, nor does he make any attempt to link such losses to PIMCO's alleged misconduct.  For example, it is impossible to tell from the Complaint whether Miller incurred losses during the period in which he alleges the Treasury market was affected by market manipulation.  The plaintiff bears the burden of pleading these basic facts, and they cannot reasonably be inferred from the Complaint, even with leniency the Court might afford Miller as a *pro se* plaintiff.  *See Goonewardena*, 2011 WL 4822553, at *2, *6 (dismissing *pro se* plaintiff's claims for lack of subject-matter jurisdiction).[4]

Additionally, Miller lacks standing under the CEA to assert a private claim for market manipulation.  To assert a claim under Section 22 of the CEA, Miller must allege that he incurred "actual damages"[5] resulting from at least one of four relationships with PIMCO:  (1) he received trading advice from PIMCO for a fee; (2) he either made a contract for futures or options through PIMCO or deposited money with PIMCO in connection with such a contract; (3) he purchased from, sold to, or placed through, PIMCO an order for

---

[4]   Miller's vague references to a potential class action (Compl. ¶¶ 8-9) do not change the analysis.  It is "'well settled that the standing requirement cannot be dispensed with by styling the complaint as a class action.'"  *In re Direxion Shares ETF Trust*, 279 F.R.D. 221 (S.D.N.Y. 2012) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

[5]   In addition, the Complaint demands punitive damages and "a criminal investigation leading to criminal sentencing."  (Compl. at 12.)  As a private plaintiff, however, Miller lacks a right to seek these remedies.  *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 669 F. Supp. 1244, 1265-66 (S.D.N.Y. 1987) ("punitive damages are not available in an implied private right of action under the CEA"); *see* 7 U.S.C § 13.

specified options or commodities; or (4) he purchased or sold a contract in which the price

of such contract, or the price of the commodity underlying such contract, was manipulated.

*Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 260 (2d Cir.

2006); 7 U.S.C. § 25(a)(1)(A)-(D).  The existence of such a relationship is strictly required

because Section 22 of the CEA "enumerates the only circumstances under which a private

litigant may assert a private right of action for violations of the CEA."  *Klein & Co. Futures*,

464 F.3d at 259.  Under even the most charitable interpretation of the Complaint, however,

Miller has not pleaded facts sufficient to show that he incurred damages arising out of any of

the foregoing relationships.  Miller does not allege that he paid for trading advice from

PIMCO or that he entered into any transaction with or through PIMCO.  Furthermore, the

Complaint does not plead a single purchase or sale of a futures or options contract, much

less one in which the market price was manipulated.

## IV.     MILLER'S CLAIM IS "FRIVOLOUS" AND SHOULD BE DISMISSED WITHOUT A RIGHT TO APPEAL PURSUANT TO 28 U.S.C. § 1915.

In addition to dismissal under Rules 12(b)(1) and 12(b)(6), the Complaint also fails

under 28 U.S.C. § 1915 ("Section 1915"), which provides for the dismissal of claims that are

legally *or factually* frivolous.  Section 1915(a)(3) also permits a court to certify that any

appeal from such dismissal would be futile and not taken in good faith.

When an action such as this one is brought *in forma pauperis* pursuant to Section

1915, the Court is empowered and obligated to dismiss any claim that is "frivolous or

malicious" or "fails to state a claim upon which relief may be granted."  28 U.S.C.

§ 1915(e)(2)(B)(i)-(ii).  The Supreme Court has held that "§ 1915(d)'s term 'frivolous,'

when applied to a complaint, embraces not only the inarguable legal conclusion, but also the

fanciful factual allegation."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  The Court in

*Neitzke*, considering a *pro se* claim, further explained that "the statute accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory,[6] but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless" when they "describe[e] fantastic or delusional scenarios."  *Id.* at 327-28.

Miller's claim has many of the trademark characteristics of claims dismissed pursuant to the frivolous or delusional standards of Section 1915.  His fantastical allegation – based on nothing more than anonymous trading data – that PIMCO employed an unidentified computer program to manipulate arguably the largest and most liquid market on earth for no rational reason is "at best, confusing and illogical, and, at worst, delusional."  *Collins v. Banks*, No. 07-CV-458S(F), 2007 WL 3124531 (W.D.N.Y. Oct. 22, 2007) (dismissing *pro se* claims under Section 1915).  In particular, the conspiracy theory underlying Miller's allegations bears similarities to other complaints dismissed pursuant to Section 1915.  *See, e.g., Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (dismissing conspiracy theory claim under Section 1915 because "courts have no obligation to entertain pure speculation and conjecture"); *O'Neil v. Ponzi*, 394 Fed. Appx. 795, 796 (2d Cir. 2010) (dismissing *pro se* complaint that "indulges in a prolix and unintelligible 'conspiracy theory novel', which fails to allege that defendants' conduct was the legal, much less the logical,

---

[6]   *Neitzke* held that the "frivolous" standard, when applied to legal theories, was stricter than Rule 12(b)(6)'s "failure to state a claim upon which relief can be granted" standard. *Neitzke*, 490 U.S. at 328-331.  The PLRA's addition of Section 1915(e)(2)(B)(ii), requiring the court to dismiss a claim that "fails to state a claim on which relief may be granted," has been read by courts as overruling that part of the holding. *Lopez v. Smith*, 203 F.3d 1122, 1126-27 (9th Cir. 2000) (confirming that the "PLRA overrule[d]" *Neitzke* and that as amended, "section 1915(e) not only permits but requires a district court to dismiss an *in forma pauperis* complaint that fails to state a claim.")  Thus, if the Court finds that the claim merits dismissal under Rule 12(b)(6), it also must be dismissed under Section 1915(e)(2)(B)(ii) and the Court may (and should) prevent Miller from appealing the dismissal *in forma pauperis* pursuant to Section 1915(a)(3).

cause of [plaintiff's] injury.").  Miller's repeated references to irrelevant topics such as the

MF Global bankruptcy (Compl. ¶¶ 28, 42), the Federal Reserve's purported plot to "rig

interest rates" (*id.* ¶ 32), JP Morgan's proprietary trading losses (*id.* ¶¶ 14, 44), same-sex

marriage (*id.* ¶ 36) and the Ivy League's failure to condemn mortgage fraud (*id.* ¶ 35)

reinforce the irrational and delusional nature of the entire Complaint.[7]  Miller's recent filings

concerning those irrelevant subjects reinforce the conclusion that his allegations are the

illogical musings of a conspiracy theorist.  *See, e.g.*, Plaintiff's Answer Concerning Potential

Reward and Motive, filed Nov. 20, 2012 (Dkt. No. 33) (denouncing the "criminal

conspiracies" protecting Jerry Sandusky, Enron, Jon Corzine, and George Anthony); Answer

CME Group Motion [sic], filed October 18, 2012 (Dkt. No. 22) (proclaiming that "Rule

12(b)(6) is bad faith," comparing it to slavery laws, arguing that "[p]rotecting Sandusky is

the same as protecting PIMCO," and stating that Miller "seeks constitutional protection from

this court after an opportunity for a hearing to address the potential trap being set from the

flawed system of flagrant hypocrisy that has destroyed the entire banking system.")

    This would not be the first time a court has considered, and dismissed under Section

1915 as frivolous, a *pro se* complaint alleging market manipulation.  A federal court in

Nebraska dismissed as frivolous a *pro se* complaint against Warren Buffet and Berkshire

Hathaway alleging, among other things:

> Buffet, either individually or as part of a conspiracy with other
> persons, planned to crash the stock market on October 11,

---

[7]    Even Miller's allegation of over $26,000 in trading losses is highly suspect in light of an affidavit he filed in support of his *in forma pauperis* application, in which he claimed to have only the most meager resources.  (*See* Declaration in Support of Request to Proceed *in Forma Pauperis*, filed May 23, 2012 (Dkt. No. 1) (attesting that Miller has $1,208 in total funds).)  Given the vitriolic derision Miller heaps upon unhedged investments in Treasury futures, which he describes as "extremely risky" gambling (Compl. ¶ 14) that would be "irrational and idiotic" to believe safe (*id.* ¶ 33), it is hard to believe that he would place nearly his entire net worth in what he deems to be such obvious peril.

> 2007, in order to steal the 'average American's money';
> evaded paying taxes; printed false annual reports for his
> shareholders; and conducted leveraged buyouts of publicly-
> traded companies.  Buffet also allegedly directed the plaintiff
> to set up 23,000 false brokerage accounts so that Buffett could
> purchase Berkshire Hathaway stock through each account for
> the purpose of falsely inflating its value.

*Riches v. Buffett*, No. 8:07CV388, 2007 WL 5659028, at *1 (D. Neb. Nov. 8, 2007).

Miller's claim is no less frivolous or delusional, and should likewise be rejected.

Under Section 1915, the Court need not look at Miller's allegations in a vacuum.

The Court may take judicial notice of court records to conclude that allegations are in fact

frivolous and should be dismissed.  *Duhart v. Carlson*, 469 F.2d 471, 473 (10th Cir. 1972)

("[A] court may take judicial notice of its own records . . . for the purpose of determining

whether an action being prosecuted *in forma pauperis*, notwithstanding that [the allegations]

are regular and sufficient on their face, [are] in fact frivolous and malicious.").  Here, the

Court may take notice of Miller's well-documented history of frivolous, delusional

allegations of commodities market manipulation.  In particular, the Court may consider the

court records documenting Miller's felony trial and conviction in 1996 for Hobbs Act

Conspiracy (18 U.S.C. § 1951) and use of interstate communication to commit extortion (18

U.S.C. § 875(b)) in connection with which Miller was found to have had delusional and

obsessive beliefs in a vast commodities market conspiracy.  *United States v. Miller*, Crim.

No. 3:94CR00254 (AHN) (D. Conn. 1996).  That case arose out of Miller's increasingly

extreme efforts to expose an imagined copper market price-fixing scheme,[8] culminating in

---

[8]     As he did in this case, Miller filed complaints with various law enforcement and regulatory
agencies such as the FBI and the CFTC alleging the existence of a copper price-fixing scheme, all of
which were rejected.  (Trial Transcript, *United States v. Miller*, Crim. No. 3:94CR00254 (AHN) (D.
Conn. dated Sept. 11, 1996) (Exhibit C to the Declaration of Jason C. Cyrulnik dated December 10,
2012 ("Cyrulnik Decl.") at 185:11-197:20); Compl. ¶¶ 13, 41 (describing Miller's efforts to inform
CME, federal prosecutors, and the FBI of his allegations).)

Miller's dispatching men to the home of a former CME Vice Chairman to intimidate him into admitting the existence of the price-fixing scheme, and in Miller's placing a death-threat phone call to the CME Chairman's fourteen-year-old daughter making similar demands.[9] (Affidavit of Lisa A. Skelly, Special Agent, FBI, *United States v. Miller*, Crim. No. 3:94CR00254 (AHN) (D. Conn. dated Dec. 7, 1994) (Cyrulnik Decl. Ex. D) ¶¶ 3-11.)

The *United States v. Miller* records show that the court held a competency hearing after which the court held that Miller suffered from delusional disorder and was mentally incompetent to stand trial. *United States v. Miller*, Crim. No. 3:94CR00254 (AHN), slip op. at 12 (D. Conn. filed Jan. 30, 1996) (Cyrulnik Decl. Ex. E). Specifically, the court found that Miller had an "obsession with the 'copper price fixing conspiracy' and the ever expanding circle of participants involved in the 'cover-up'."[10] *Id.* at 8. This ruling was based in large part on the testimony of a doctor who examined Miller, and who testified that Miller's "delusional disorder has both grandiose and paranoid features. What I mean by that is that there is a very elaborate rather circumscribed non-bizarre delusional belief of conspiracy on the part of the commodities market to have fixed prices. . . . There's also a grandiose quality in that he believes that he has special insight or special knowledge

---

[9]   Miller demanded that these individuals pay him millions of dollars out of their proceeds from the fraud. Miller explained to the former Vice Chairman that by making the payment, he would concede the existence of the price-fixing scheme because "if you weren't guilty of anything you should call the FBI and have me arrested for extortion and threatening to murder you." (Affidavit of Lisa A. Skelly, Special Agent, FBI, *United States v. Miller*, Crim. No. 3:94CR00254 (AHN) (D. Conn. dated Dec. 7, 1994) (Cyrulnik Decl. Ex. D) ¶ 8.)

[10]   In its decision, the court also relied upon thirteen letters Mr. Miller sent from jail to U.S. Attorney Mary Jo White asserting that the Judge to whom his case was assigned had been "abducted" by the perpetrators of the COMEX copper scam and that she needed Miller's help to find and rescue Judge Nevas. *United States v. Miller*, Crim. No. 3:94CR00254 (AHN), slip op. at 8-10 (D. Conn. filed Jan. 30, 1996) (Cyrulnik Decl. Ex. E).

regarding this conspiracy."[11]  (Transcript of Competency Hearing, *United States v. Miller*,

Crim. No. 3:94CR00254 (TFGD) (D. Conn. filed Nov. 20, 1995) (Cyrulnik Decl. Ex. F) at

24:12-16, 25:8-10.)  As the court observed, the circle of alleged co-conspirators involved in

the imagined copper price-fixing conspiracy grew to include United States Attorney General

Janet Reno, United States District Judge Alan H. Nevas, United States Attorney for the

Southern District of New York Mary Jo White and others.  *United States v. Miller*, No.

3:94CR00254 (AHN), slip op. at 6-7 (Cyrulnik Decl. Ex. E).  Miller even believed that his

counsel was "a co-conspirator in the COMEX fraud" and was "conspiring with the

Government."  (Transcript of Competency Hearing, *United States v. Miller*, Crim. No.

3:94CR00254 (TFGD) (D. Conn. filed Nov. 20, 1995) (Cyrulnik Decl. Ex. F) at 7:4-6.)

Indeed, in sentencing Miller, the court expressed concern about his capacity for future

misconduct and delusions:

> Now, Mr. Miller, I don't know what to say to you.  I think that
> everything that I wanted to say to you I've said over the last
> two years.  You've been before me many, many times.  *I've
> just heard you say that you've learned your lesson and you're
> not going to be back in any court again.  I don't know whether
> that's true or not.  I mean there are certain forces working
> inside of you that may overcome that, that kind of rational
> thinking and cause you to think irrationally.*  The very fact
> that you said you don't want to be in a medical facility nor
> around people who you think have mental problems is a
> failure to recognize that your own behavior is irrational,
> questionable.  You're not a stupid person.  You have to know,
> if you think about it on one level, that what you did was
> irrational and it was only going to lead to your arrest and
> ultimate conviction.  But you went ahead and did it
> anyway.  *And whether you'd do it again?  I don't know.  I
> suspect you might.*

---

[11]   Miller's recent filings evidence this same sort of delusional, "grandiose" thinking underlying
the present action.  For example, in his so-called "Memorandum of Facts," Miller claims that
"nobody but this plaintiff recognizes the obvious, simple fraud claimed to be too complex for
economic professors at Harvard, Columbia, and the most revered business schools to grasp."
(Plaintiff's Mem. of Facts at 4 (Dkt. No. 30).)

(Transcript of Sentencing Hearing, *United States v. Miller*, No. 3:94CR00254 (AHN),

December 6, 1996 (Cyrulnik Decl. Ex. G) at 32-33 (emphasis added).)

      Given the striking similarities between Miller's present market manipulation claim

and his well-documented history of making delusional market manipulation accusations, the

Court should take notice of relevant prior court records when determining whether Miller's

Complaint merits dismissal under Section 1915.  *See Jones v. City of New York*, Nos. Civ.A.

99-8281, Civ.A. CV-00-370DGT, (DGT)2000 WL 516889, at *3 (E.D.N.Y. Mar. 15, 2000)

(dismissing *pro se* actions under Section 1915 and holding that the plaintiff's "history of

mental illness and continued medical treatment for his psychiatric problems further argues in

favor of finding that his allegations are the product of delusion").

## <u>CONCLUSION</u>

      For the foregoing reasons, the claim should be dismissed with prejudice, and the

Court should certify that an appeal from such dismissal would not be taken in good faith

pursuant to 28 U.S.C. § 1915(a)(3).

Dated:  December 10, 2012
       Armonk, New York

               Respectfully Submitted,

               BOIES, SCHILLER & FLEXNER LLP

              By:<u>*/s/ Jason C. Cyrulnik*</u>
                Robert B. Silver
                Jason C. Cyrulnik
                333 Main Street
                Armonk, NY 10504
                914.749.8200
                *Attorneys for Defendant Pacific Investment*
                *Management Company LLC*