IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12-17-12

STEPHEN A. MILLER,

              Plaintiffs,

    -   against —

PACIFIC INVESTMENT MANAGEMENT Company LLC,
PIMCO FUNDS,
CME GROUP INC.
Mohamed A. El-Erian    (PIMCO)
Stephen A. Rodosky    (PIMCO)
Kathleen Cronin    (CME)
Joseph P. Adamczyk    (CME)
              Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action #**
**12CV 4122 (LTS)**

**JURY TRIAL**
**DEMANDED**

## AMENDED COMPLAINT

Fed. R. Civ. P. 15(a). allows one amended complaint without obtaining the court's permission. If the defendant files a motion to dismiss pursuant to Fed. R. Civ. P. 12(b), (e), or (f), you may amend your complaint within twenty-one (21) days after the motion is served upon you. See Fed. R. Civ. P. 15(a). The PIMCO **MOTION TO DISMISS** was filed December 10, 2012.

PIMCO promotes its shares to the public for investment. Going long Treasury futures is extremely risky and it is crazy for any bond fund. The obvious failure to understand that the risk to any bond fund adds risk by being long Treasury futures when interest rates can go higher especially when the government deficit is out of control is beyond dumb. PIMCO knew it had the sufficient capital to illegally manipulate and

1

control Treasury futures prices. PIMCO used the common myth that Treasuries are a safe haven. PIMCO designed a computer program to bid up Treasury futures contracts each time the Dow Jones Industrial futures contracts dipped more than 30 points around the clock. Dow Jones futures contracts trade from 1830 EST to 1700 EST.

Only a lunatic or an imbecile would purposely bid prices higher without the illegal intention PIMCO implemented to raise bond prices temporarily to gouge a higher fee from their customers and use that excess fee to pay off $118,750,000 to the plaintiffs from the 2005 case.

It is apparent that the CMEG, the CFTC, the SEC, the DOJ, and the Judicial Branch are too unsophisticated and too uneducated to understand this improper derivatives strategy. That does not mean that even one official isn't intelligent. My intention is to explain derivatives and answer any question directly about derivatives to this court. The only legitimate, viable derivatives strategy for any bond fund would be hedging by only being short Treasury futures. This is a simple unequivocal fact. In 1982 the yield on Treasury bonds peaked at 15.5%. The price of Treasury bond futures was 55 compared to 151 at the current yield of 2.79%. Current prices and yields have been forced down by the Federal Reserve Chairman Bernanke who doesn't have a magic wand.

This court in this case has a unique opportunity to use the power created by our founding fathers' wisdom who gave the Judicial Branch life time appointments. This case is the check and balance that needs to be implemented to stomp out the corruption by the executive and legislative branches. The plaintiff intends to demystify the notion that derivatives are complicated before this court. The plaintiff only needs the opportunity to

depose the defendants in this case to produce the evidence for this court. The constant unrebutted claim that derivatives are complicated is being used to commit crimes that have collapsed our entire banking industry in addition to the 2010 fraud by PIMCO.

Is any bond fund allowed to bet shareholders money on horse races, dice games, and slot machines? There is no difference when a bond fund bets the shareholders investment by going long Treasury futures. Was PIMCO long Treasury futures because they were crazy or is PIMCO going to claim it was rigging the Treasury futures market?

If PIMCO was allowed to dope horses or cheat casinos that would be the same as being allowed to rig Treasury futures by the CMEG, the CFTC, and the DOJ. These are the facts of this case. This plaintiff has the exact same legal standing that the class had in the 05C 4681 (RG) UNITED STATES DISTRICT COURT for the Northern District of Illinois Eastern Division case.

There was no fiscal cliff in 1982. The Chairman of the Federal Reserve, Paul Volker, wasn't a berserk imbecile. How many more economic disasters will happen from so called complicated derivatives strategy that aren't complicated at all? Does this court care about the viability and prosperity for America? The epidemic of fraud can be ended by Your Honor who has access to all her colleagues in this court house. They are a powerful group of officials with direct contacts to the media.

Americans are brainwashed daily by media propaganda that they are exceptional. They are exceptionally arrogant, ignorant, liars. When they are dead wrong claiming Treasuries are a safe haven, some other nonsensical lie will be their answer. The American swamp of hypocrisy is bottomless, it has no end. They actually believe no amount of debt will ever collapse the American currency. The leader of this preposterous,

exceptional arrogance is a man named Ben Bernanke who should be certified delusional. There is nobody but the plaintiff who states unequivocally that Treasuries are dangerous and scoffs at the absurd, nonsensical claim "Treasuries are a safe haven". Facts are completely irrelevant. There is no rock bottom in America.

Paying $118,750,000 to settle a fraud is a vivid contradiction by any innocent defendant. A payment of $118,750,000 is a simple fact by this defendant (PIMCO) charged with manipulating Treasury futures prices to reduce its potential exposure to a higher payment. Insulting the intelligence of the court by claiming Treasuries can't be manipulated is contempt proved by the payment of $118,750,000. This is bad faith arrogantly pushed into the face of the court.

No Federal judge can be so stupid to believe this ridiculous contradiction. Is paying $118,750,000 an insanity defense by a defendant claiming innocence? That would qualify as legally incompetent. Does the defendant fail to understand the proceedings and is the defendant incapable of assisting counsel?

Counsel then claims the Treasury market is too large and too liquid to be manipulated. First of all paying $118,750,000 for manipulating the Treasury market admits PIMCO manipulated the Treasury market in 2005.

Second of all concentrating $300,000,000 margin for a period of a few hours on the 10 year note contract that requires $1,485 for a $100,000 contract (30 year bond $3780 and 5 year note $743) is equivalent to discharging the entire nuclear arsenal from the American submarine fleet. Attacking treasury prices by bidding up the price of actual trades by PIMCO is recorded in the Large Trader Reports being hidden by PIMCO, the

CMEG, and the CFTC from the court. The power of this court is able to subpoena the Large Trader Report from defendant CMEG or the CFTC.

An innocent defendant wouldn't hide hard evidence that proves innocence. PIMCO would show good faith to the court by offering the PIMCO Large Trader Report for July, August, and September 2010. In contrast the months before and after July, August, and September 2010 would show little or no large trades.

"A litigant has to state a claim before he or she is entitled to discovery." *Bridgewater v. Taylor,* 745 f. Supp. 2d 355, 358 (S.D.N.Y. 2010) is only the first of every irrational, bogus barrage of irrelevant lies to the court cloaked in cases cited that are irrelevant to these specific proceedings. Council's strategy to flagrantly lie to the court is a bottomless swamp. Will this court allow another six year bottomless swamp of lies and incoherent irrational mumbo jumbo by council to grind away injustice?

The decision by the CMEG to protect PIMCO at the expense of all other traders is exactly the same as the Penn State decision to protect Sandusky when Sandusky raped boys in the Penn State facility. Both decisions qualify as psychotic and criminal. A deposition of the primary defendant by the plaintiff would give the court a glaring picture of the evidence available to prove the plaintiff's charge. Will the lesson of the Penn State, Sandusky fiasco be learned?

Only a full blown certified lunatic who was innocent of a charge would actually pay $118,750,000 to settle any case and then have the nerve to claim being innocent. PIMCO and their counsel are in a bottomless pit of mumbo jumbo false claims on their face from some other galaxy. A deposition of the primary defendant (Mohamed El-Erian) who made the false statements on CNBC and Bloomberg would be glaring evidence to

the court that can't be matched by written pleadings from counsel that are absurd lies to the court.

**"By entering into the Settlement Agreement with Plaintiffs, Defendants do not admit and instead continue to deny that they engaged in any unlawful conduct."**

### B. Procedural History of the Action

On August 26, 2005, Plaintiffs filed an initial class action complaint against Defendants in the United States District Court for the Northern District of Illinois. Defendants moved to dismiss Plaintiffs' complaint on February 2, 2006, which motion was required to assume temporarily that Plaintiffs' factual allegations were correct and show that even so the claims were legally sufficient. On July 31, 2007, the Court substantially denied that motion, finding *only* that *if* Plaintiffs could prove their allegations, then they had stated a legally sufficient claim.

PIMCO was able to drag out their dismissal motion for 23 months and 26 days before their motion was denied. No innocent defendant would use this strategy. An innocent defendant would want to protect their reputation as soon as possible in a court of law. Does this court want another marathon?

After that past experience ended by paying $118,750,000 and legal fees for failing to win any appeal for five years and seven months from August 26, 2005 until April 7, 2011 an innocent defendant would welcome an acquittal at trial as quickly as possible. The evidence for this case isn't a nonsensical theory about "cheapest to deliver" (CTD), the evidence is actual trades that created 90 consecutive mountains of trades that forced the price higher to produce a bogus fee, and then a market collapse from October 2010

until February 2011 when PIMCO ended their manipulation the Treasury bond futures contract dropped from 135-00 to 117-00, a loss of $28,000. Calling that a safe haven is preposterous.

When the court examines the trades made by PIMCO the court will plainly see the bidding to pay the worst possible prices, 90 times in a row at the times recorded in the "Time & Sales Register". The CFTC and the CMEG don't want the court to examine the Large Trader Report by PIMCO because that evidence is unmistakable.

The following statements about (CTD) cheapest to deliver, selling futures while buying cash notes, and lending notes are complete nonsense.

**"Defendants have consistently and vigorously denied Plaintiffs' claims. This denial includes arguing that the Commodity Futures Trading Commission itself found that the increases in the prices of the June 2005 Contract were due to exogenous market factors rather than to the Defendants' conduct. Defendants' denials and contentions further include the position that although PIMCO was alleged to have been "long-long" and to have hoarded the cheapest-to-deliver ("CTD") notes, the fact is that PIMCO reduced its futures position as it acquired CTD notes, largely traded into non-CTD instruments when unable to transfer its position, and, <u>most importantly</u>, in consultation with regulators lent its notes and thereby gave up control of them to the market."**

The CFTC could have been called as a witness to explain their theory "that the increases in the prices of the June 2005 contract were due to exogenous market factors

rather than to the defendants' conduct". The CFTC and the DOJ will be called as hostile witnesses by this plaintiff to testify why they are silent and why they are conspiring with the defendants in this case.

Lending notes has no price because lending is not trading. This paragraph is meaningless mumbo jumbo. The CFTC will be called to testify as witnesses. The CFTC and DOJ are committed to protect Wall Street crooks including Jon Corzine. They have absolute immunity to commit crimes. Will this court use its power given the judicial branch of life time appointments to reverse the corruption by the executive branch?

**"Plaintiffs acknowledge that if these risks materialized their impact would have been substantial and perhaps dispositive that is, including the risk of receiving no recovery whatsoever."**

PIMCO stole the money from its shareholders by overcharging the PIMCO September 2010 fee to pay the $118,750,000 for the 05C 4681 (RG) Northern District of Illinois Eastern Division case settlement.

Plaintiffs' counsel received a 20% fee, $23,750,000 and reimbursement of their costs and expenses in the amount of no more than $1,810,000—all to be deducted from the Settlement Fund.

## PLAINTIFF'S DAMAGES

The plaintiff lost $26,800 from the plaintiff's account.

The plaintiff requested the CFTC and the DOJ on August 25, 2010 to stop the crime. The CFTC, the FBI, the US Attorney for the SDNY, and the Chief of the Securities and Commodities Fraud Task Force SDNY refusal to do their job at tax payers' expense cost the plaintiff the opportunity to earn at least $104,000 after PIMCO voluntarily ended their

manipulation. Even the Office of Inspector General for the CFTC and the DOJ refused to do their job. The officials of the American check and balance system ignore the laws and violate the economic viability of America. The Jon Corzine theft from 38,000 MF Global accounts is the cornerstone of government corruption by the executive branch of our government.

Time spent searching for a competent lawyer was 22 months cost $118,750.

Time spent preparing this law suit is open ended.

Punitive award $237,500,000 is double the settlement price they chose.

Total damages are $237,918,300.


Plaintiff Stephen A. Miller, brings the Commodity Exchange Act ("CEA") action on behalf of himself. Plaintiff's claims are based upon knowledge and factual proof. Public false statements broadcast repeatedly by the defendants' spokesperson in conjunction with 90 consecutive, concentrated trades documented by the time and sales official exchange records conclude the defendants intended to artificially raise the price of three separate ( 30 year bond, 10 year note, and 5 year note ) Treasury futures contracts during July, August, and September 2010 to artificially raise fixed income prices (lower interest rates) to gouge higher fees from PIMCO fund shareholders. As and for the Complaint, plaintiff alleges as follows:

## I.     SUMMARY OF ALLEGATIONS

During July, August, and September 2010 the CEO of Pacific Investment Management Company (hereinafter PIMCO), Mohamad A. El-Erian was a guest many more times than his prior and successive appearances on CNBC and Bloomberg claiming repeatedly there would become a "new normal" price for the 10 year US Treasury notes that he predicted would drop from its normal yield range of between 5.5% to 3.5% during

the span of years from 1988 to 2010, to a "new normal" yield of 2.5%. The 2008 stock market panic set off a two month spike that reached 2.5% for a few days reacting to the myth that Treasuries are a safe haven. That safe haven crashed from 143-00 to 113-00, a $30,000 safe haven loss.

A computer program created to drive the price of US Treasury futures higher that was triggered by a PIMCO bidding surge on a round the clock basis when each time the Dow Jones futures contract dropped by more than 30 points that began in July 2010 and ended in October 2010  made the "new normal" forecast come true. The connection of Treasury prices to declines in the Dow Jones futures was based on a false, but commonly accepted myth that Treasuries are a safe haven when stocks are collapsing.

Net inflows into bond funds reached $120 billion year to date at the end of August as investors became more risk averse, Pimco's chief executive and co-chief investment officer said in a radio interview today on "Bloomberg Surveillance" with Tom Keene reported September 10, 2010. "The yield on the benchmark 10-year Treasury note may fall to 2.5% or below," El-Erian said.

After the inflated September quarter fee was billed to Pimco shareholders on September 30, 2010, the PIMCO bidding computer program ended and the Treasury prices collapsed until they hit bottom in February 2011 higher than 3.5%, as the constant "new normal" prediction ended abruptly in early October 2010.

On 7/15/2010 the September Treasury bond contract (USU symbol) was 126-08 at 0730.

On 8/25/2010 the USU was 136-28 at 0900, an increase of $10,625 on a $100,000 bond contract.

When the artificial price ended in October 2010, the price collapsed from 135-05 to 117-00 in February 2011 for the March 2011, 30 year Treasury futures contract. The 10 year Note Treasury futures contract dropped from 128-00 to under 119-00.

During each of the 90 consecutive intervals (within a 48 trading day span) specified in the plaintiff's audit filed with the CME Group and the CFTC there were huge volumes of contracts purchased all at the offer price executing the worse possible price for PIMCO by PIMCO, forcing prices higher. That generated the highest September quarter fee possible paid by PIMCO fund shareholders to PIMCO management and it made the Defendant's "new normal" prediction come true for a few days.

No other bond fund ever goes long Treasury futures. Being long futures in a bond fund adds severe risk to the portfolio. Shorting Treasury futures shifts the risk (hedges) from the fixed income securities in the portfolio and allows the fund manager to be able to reposition bonds in the portfolio at no loss whenever bond prices decline always gaining a higher yield for shareholders. That is the legitimate purpose for using futures contracts.

During the intervals of time when the PIMCO rigging program wasn't being implemented there were price dips in all three Treasury contracts. During these dips a small number of short position traders may have made profits. The vast majority of short position traders were forced to take losses when they liquidated their short positions resulting from the artificial prices.

All persons and entities that purchased the September 2010 or December 2010 5 year note, 10 year note, and/or 30 year bond futures contracts to liquidate a short position between July 15, 2010 and September 30, 2010 are eligible to be in the class.

(That assumes the potential for a securities fraud class action attorney to amend this case after it begins.)

All persons who bought Treasury August, September, or October 2010, 5 year note, 10 year note, or 30 year bond puts or sold August, September, or October 2010, 5 year note, 10 year note, or 30 year bond calls would be eligible to be in the potential class.

The US Treasury futures and options contract market is traded worldwide around the clock except for the hour break from 1700 to 1830  Eastern time daily and its weekend close from Friday 1700 until Sunday 1830 Eastern time. Members of the potential class losses exceeded $17,000,000,000.

Defendants generated enough momentum of prices during the 90 separate times they manipulated the price higher to attract momentum traders to whom the manipulators could dump most if not all their positions until the following trigger began when the Dow Jones futures contract began its next 30 point decline. The enormous size of the single trader bidding prices higher could not be missed by the surveillance of the CME Group.

The CME Group claims to be a "Self Reporting Organization" (SRO). The plaintiff provided the precise times for each of the 90 consecutive manipulations by the defendant. Rather than report the gargantuan positions to the CFTC and DOJ, to fulfill and comply with the (SRO) status, the executives of the defendant CME Group claimed the information which they are privileged to know must be hidden at the expense of all other traders on the short side of the Treasury market.

II      **BOND FUND CUSTOMER OBJECTIVES**

The benefits offered to investors by all bond funds are safety of principal and fixed return that is dependable. Being long Treasury futures contracts is extremely risky. There is no difference between the risk of US Treasury futures and the risk of soybean, cattle, silver, oil, or any other commodities futures contracts. There is absolutely no difference from being long US Treasury futures contracts or betting at a casino, betting horses, and betting sporting events. JP Morgan just proved the risk of speculation commonly called "proprietary trading" in May 2012.

The only legitimate purpose for any bond fund to use US Treasury futures is to shift the risk against the potential for higher interest rates with the decline of bond prices. Any bond fund that doesn't shift the risk (hedge) is a complete ignorance by the management of the bond fund. Shifting the risk from a long bond position can only be accomplished by a short futures contract position.

The reason that grain elevators always earn profits is they always shift their risk of daily price swings of corn, wheat, soybeans, and other commodities they purchase from farmers. Grain elevators never bet on weather, acreage planted or any other variables that change prices every minute of the trading day by their offset futures contract positions.

The fact that PIMCO went long US Treasury futures isolates them as the only potential suspect for the artificial prices they created during July, August, and September 2010. In December 2011 PIMCO settled the civil action 05C 4681 (RG) for manipulating US Treasury futures with a position long $16,000,000,000 (160,000 10 year note contracts). While that is a large position, the size of this case dwarfs that position.

The margin necessary to generate the 90 individual trades executed by PIMCO during the 48 day trading period from July 2010 to October 2010 could be managed with $300,000,000. For an institution with more than $1.3 trillion under management, $300,000,000 is no constraint.

The PIMCO program operated around the clock. The amount of contracts necessary to move the market higher would vary greatly during the day compared to the middle of the night when trading is very light.

The excessive fee PIMCO charged their customers for the September 2010 quarter of approximately $150,000,000 more than paid their settlement of $118,750,000, for the aforementioned 2005 case.

**III        JURISDICTION AND VENUE**

This Court has jurisdiction over this action pursuant to Sections 1a(4) and 22 of the CEA, 7 U.S.C. § 25, AND 28 U.S.C. § 1331 and 1337.

Venue is proper in this District pursuant to 15 U.S.C. § 15(a), pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. § 1391(b), (c) and (d). The Defendants transacted business in the Southern District of New York, and a substantial part of the events are transacted electronically by computer from any location on the planet. Defendants' unlawful acts manipulated the prices of all three Treasury futures contracts (5 year notes, 10 years notes, and 30 year bonds) which are all traded electronically. The CME Group surveillance of computer trading is performed from its observance of electronic trades created around the clock. There is no physical location required to perform surveillance of customer trades generated by computers from any location. The Southern District of New York is uniquely located in the financial capital of the world.

Defendants made use of the means and instrumentalities of interstate commerce with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

Plaintiff Stephen Miller is a resident of Bridgeport, Connecticut. Plaintiff Stephen Miller transacted in Treasury futures contracts and options contracts and was injured in his property as a result of Defendants' unlawful conduct.

Defendant PIMCO is the largest bond fund in the world and a leading global financial services firm with a prior record of rigging Treasury futures contracts in the 2005 Civil Action 05C 4681 (RG) decided in the UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DISTRICT. PIMCO is incorporated in the state of Delaware and is headquartered at 840 Newport Center Drive, Newport Beach, California 92660.

PIMCO Funds is a Massachusetts trust registered open end management investment company consisting of separate portfolios. PIMCO, through Mohamed El-Erian and various other persons, caused PIMCO Funds to combine false statements with 90 specific timed computer bidding to create artificial prices that made the repeated false statements to come true.

Mohamed El-Erian acted with Stephen Rodosky and other associates whose identities are unknown to the plaintiff.

CME GROUP Inc. (CME) is the commodities exchange that claims to be a Self Reporting Organization (SRO). CME is a Delaware corporation located at 20 South Wacker Drive, Chicago, IL 60606. CME is a defendant in the MF Global bankruptcy in which CME has protected Jon Corzine at the expense of the MF Global customers. CME

is also a defendant in the SOUTHERN DISTRICT OF NEW YORK for its vivid protection of the only possible suspect with motive and access to the missing customer funds of MF Global.

Joseph P. Adamczyk, Director, CME Global Head of Enforcement and Kathleen M. Cronin, CME Managing Director, General Counsel both refused to do their job creating a conflict of interest with all Treasury futures and options traders during July, August, and September 2010. Their irresponsible performance is again demonstrated by the Jon Corzine, stealth of 38,000 customer funds held by MF Global. Their criminal actions are deliberate rather than incompetent.

### IV.    SUBSTANTIVE ALLEGATIONS

The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. A key purpose of the CME rules and amendments is to prevent price manipulation being fair to all traders.

The information and knowledge of the exact details of the precise size of each of the 90 successive trading positions of the September and December 2010 five year Treasury Notes, ten year Treasury Notes, and 30 year Treasury Bonds futures contracts bought long and liquidated in a matter of hours during the September 2010 quarter are not exclusively within the possession of PIMCO, they are in the possession of the CME and the CFTC too. That information is neither publicly available nor available to the plaintiff absent discovery.

Customers of bond funds are investing their savings in safe securities with modest returns. They don't expect to break the bank gambling on unpredictable, hourly strategies that trade Treasury futures from the long side. After PIMCO had rigged the entire

Treasury market higher with 90 successive trades that exploited the myth that Treasuries are a safe haven, a reasonable expectation by PIMCO would know the bubble they created unilaterally would burst. If PIMCO then hedged its inflated value with a short Treasury futures contract position, they would have protected the inflated value for its own customers they had just ripped off. By not hedging on October 1, 2010 with a short Treasury futures position, the PIMCO shareholder fund shares collapsed in synch with the collapse of the Treasury securities and futures prices until February 2011. This collapse occurred in spite of the "Quantitative Easing II" policy (QE2) publicly announced and implemented by the Federal Reserve.

The only and exclusive force that determines interest rates in a legitimate free market is inflation. The simple and obvious premise that a 5% return when inflation is 10% is a negative return was proven when Treasury bonds in 1982 traded at 15.5%. Before the misguided policy by the Federal Reserve Chairman Ben Bernanke to rig interest rates with QE2 and to "print" money (a monetary policy that is crazy and unsustainable) there has been a close correlation between Treasury yields and inflation. The sharp drop of the velocity of money is the only reason for the constant low inflation.

An actual safe haven would be an investment in Treasury securities if the price risk is completely neutralized with a short Treasuries futures contract. There is no safe strategy when an investment in fixed income securities is coupled with a long position of Treasury futures contracts. Doping horses to win races is no different than the strategy PIMCO used during July, August, and September 2010 to program massive bidding of Treasury futures that was coupled with the small dips triggered by the Dow Jones futures

contracts around the clock even when Dow Jones futures had violent swings separate from no American stock trading after the 4:00 PM close of trading.

Glaring Wall Street fraud has become common place in America. "No doc loans", "teaser rates" extorting bogus prices from real estate appraisers to enhance mortgage fees, packaging worthless mortgages into securitized packages blessed by the rating agencies AAA designation has been rewarded with annual Wall Street bonuses exceeding $40 billion each year. Not one of the elite universities (Harvard, Yale, Princeton, Columbia, Wharton etc.) has condemned these obvious frauds.

Media pundits are focused daily on same sex marriage while the massive Wall Street frauds grab headlines for a day or two. While the media propaganda argues about 8% unemployment there are more than 45,000,000 Americans qualified for food stamps. There are no lessons learned in America, JP Morgan just proved that in May 2012, with a massive loss of deposits by traders located in London. Gambling is called "proprietary trading". The crimes are claimed to be too complicated for anybody to understand. At first the JP Morgan loss was claimed to be $2 billion, a week later the estimate is $5 billion. Only an entire book can report the extent of the financial fraud allowed by government officials who collect bribes from the perpetrators, they call "campaign contributions".

A deposition of the PIMCO and CME defendants would reveal the necessary facts for trial.

### THE PIMCO RAP SHEET

On September 13, 2004, various PIMCO entities agreed to pay $50,000,000 and consented to cease and desist orders and to undertake reforms of their compliance and

corporate governance in order to settle charges that they willfully violated or aided and abetted violation of (a) the antifraud provisions of the Investment Advisors Act of 1940 ("IAA"); (b) Section 17(d) of the Investment Company Act of 1940 ("ICA"); Section 34(b) of the ICA; and (d) Section 204A of the IAA. The SEC Order found that the PIMCO entities willfully violated each of the foregoing laws.

On September 15, 2004, various PIMCO entities agreed to pay over $11.6 million and to undertake disclosure and compliance reforms in order to settle SEC charges that they violated (a) Section 206(2) of the IAA and Sections 12(b), 15(c), 17(d), and 34(b) of the ICA. The SEC Order found that PIMCO entities violated the foregoing sections of the law.

The aforementioned penalties paid by PIMCO has failed to deter subsequent manipulative acts that resulted in a $118,750,000 cash settlement for Civil Action 05C 4681 in December 2011. To cover that cost PIMCO profited by its September overcharge of approximately $150,000,000 and unknown futures trading used to artificially increase the price (not the value) of its customers share prices which collapsed when the defendants' manipulation in July, August, and September 2010 ended.

A written criminal complaint dated August 23, 2010, investigation by the plaintiff to SDNY US Attorney has been ignored in addition to a subsequent criminal complaint dated December 8, 2011, to the District of Connecticut US Attorney and FBI S/A Gary Dagan who claimed to refer the complaint to the SDNY.

The DOJ reaction to the Jon Corzine, MF Global criminal acts confirms the pattern of protecting the most spectacular Wall Street crooks even when they receive media attention.

Defendants' activities alleged herein created artificial prices of September and December 2010 Treasury futures and options contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. § 13(a)(1), and (25(a)(1).

The plaintiff suffered a loss of $26,880 and the potential to earn $104,000 as a result of defendants' manipulation of the price of the aforementioned Treasury futures and options contracts. All other unnamed parties who lack the experience, knowledge, and sophistication of the plaintiff suffered losses exceeding $17 billion resulting from PIMCO and the cover up by CME.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff's prayer for relief as follows:

That plaintiff is allowed to recover actual damages in addition to punitive monetary sanctions.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable.

Dated:          December 12, 2012          Respectfully Submitted,

By Stephen A. Miller, pro se
83 Waldorf Avenue
Bridgeport, CT 06605
Telephone: 203-923-1680

## CERTIFICATE OF SERVICE

I, Stephen A. Miller certify that on December 12, 2012 this Amended Complaint was mailed by USPS to counsel of record for all defendants.

20

Stephen A. Miller
83 Waldorf Ave
Bridgeport, CT 06605-2548

12-CV-04122 (LTS-JCF)

RECEIVED
SDNY PRO SE OFFICE
2012 DEC 17 A 11:56

US DISTRICT COURT
SDNY PRO SE OFFICE
500 PEARL ST ROOM 230
NY NY 10007-1312

USM
SDNY



U.S. POSTAGE
PAID
BRIDGEPORT, CT
06605
DEC 14, 12
Amount
$2.30
00059763-03