**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

STEPHEN A. MILLER,                                    :
                                                      :
                                    Plaintiff,        :    Case No. 12-CV-4122 (LTS) (JCF)
                                                      :
                     v.                               :    ECF CASE
                                                      :    ELECTRONICALLY FILED
PACIFIC INVESTMENT MANAGEMENT                         :
COMPANY LLC, et al.,                                  :
                                                      :
                                    Defendants.       :

-------------------------------------------------------- x

## CME GROUP DEFENDANTS' MEMORANDUM
## OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

Dated: December 31, 2012          SKADDEN, ARPS, SLATE, MEAGHER &
                                  FLOM LLP
                                  Charles F. Smith
                                  (charles.smith@skadden.com)
                                  Jerrold E. Salzman
                                  (jerrold.salzman@skadden.com)
                                  Jason T. Manning
                                  (jason.manning@skadden.com)
                                  Brandon R. Keel
                                  (brandon.keel@skadden.com)
                                  155 North Wacker Drive
                                  Chicago, IL 60606
                                  Tel: 312.407.0700
                                  Fax: 312.407.0411

                                  Lauren E. Aguiar
                                  (lauren.aguiar@skadden.com)
                                  Four Times Square
                                  New York, NY 10036
                                  Tel: 212.735.2235
                                  Fax: 917.777.2235

                                  *Counsel for Defendants CME Group, Inc.,*
                                  *Kathleen Cronin, and Joseph Adamczyk*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND AND AMENDED COMPLAINT ....................................................3

ARGUMENT ............................................................................................................8

    I.     PLAINTIFF'S AMENDED COMPLAINT FAILS TO SATISFY THE
           PLEADING REQUIREMENTS OF RULES 8(a) AND 9(b) ...............................8

    II.    CMEG IS NOT THE PROPER PARTY TO THIS CASE...................................11

    III.   PLAINTIFF'S DISCIPLINARY CLAIM IS BARRED BY ABSOLUTE
           IMMUNITY.................................................................................................12

    IV.   PLAINTIFF'S AMENDED COMPLAINT FAILS TO STATE A CEA
           CLAIM BECAUSE HE HAS NOT PLED FACTS SHOWING BAD
           FAITH OR LOSS CAUSATION .......................................................................16

          A.    Plaintiff Has Failed to Plead Bad Faith.....................................................17

          B.    Plaintiff Has Failed to Plead Loss Causation.............................................18

    V.    PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES IS NOT
           AVAILABLE IN THIS MATTER .......................................................................18

CONCLUSION...........................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*In re Amaranth Natural Gas Commodities Litigation,*
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)...........................................................................9

*American Agricultural Movement, Inc. v. Board of Trade of the City of Chicago,*
    977 F.2d 1147 (7th Cir. 1992) ...................................................................................3

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................................9

*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007).........................................................................................9

*Austin v. National Association of Securities Dealers,*
    757 F.2d 676 (5th Cir. 1985) ...................................................................................13

*Barbara v. New York Stock Exchange,*
    99 F.3d 49 (2d Cir. 1996) ..........................................................................12, 13, 14

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................8, 9

*In re Crude Oil Commodity Litigation,*
    No. 06 Civ. 6677(NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007)...............9, 10

*D'Alessio v. New York Stock Exchange,*
    258 F.3d 93 (2d Cir. 2001).......................................................................................13

*Gugliaro v. N.Y. Coffee, Sugar & Cocoa Exchange, Inc.,*
    No. 96 Civ. 4942(JSM), 1997 WL 109442 (S.D.N.Y. Mar. 11, 1997) ...............14, 15

*Imbler v. Pachtman,*
    424 U.S. 409 (1976)..........................................................................................12, 13

*Mandelbaum v. New York Mercantile Exchange,*
    894 F. Supp. 676 (S.D.N.Y. 1995)..........................................................12, 13, 14, 15

*In re Merrill Lynch & Co., Inc.,*
    273 F. Supp. 2d 351 (S.D.N.Y. 2003)......................................................................11

*Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    669 F. Supp. 1244 (S.D.N.Y. 1987)........................................................................19

*Minpeco, S.A. v. Hunt,*
    693 F. Supp. 58 (S.D.N.Y. 1988).............................................................................17

*In re Natural Gas Commodity Litigation*,
337 F. Supp. 2d 498 (S.D.N.Y. 2004)........................................................12

*In re NYSE Specialists Securities Litigation*,
503 F.3d 89 (2d Cir. 2007)........................................................12, 13, 15

*Ruotolo v. City of New York*,
514 F.3d 184 (2d Cir. 2008)........................................................8

*Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*,
748 F.2d 774 (2d Cir. 1984)........................................................17

*Sam Wong & Son, Inc. v. New York Mercantile Exchange*,
735 F.2d 653 (2d Cir. 1984)........................................................3, 17

*Vitanza v. Board of Trade of the City of New York*,
No. 00 CV 7393 (RCC), 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002)......................16

*Western Capital Design, LLC v. New York Mercantile Exchange*,
180 F. Supp. 2d 438 (S.D.N.Y. 2001)........................................................17

**Statutes**                                                                 **Page(s)**

7 U.S.C. § 7........................................................3, 11, 14

7 U.S.C. § 13a........................................................3

7 U.S.C. § 13a-1........................................................3

7 U.S.C. § 25........................................................passim

**Other**                                                                    **Page(s)**

http://www.cmegroup.com/trading/interest-rates........................................................3

http://www.cftc.gov/IndustryOversight/TradingOrganizations/index.htm........................4, 11

http://www.cmegroup.com/trading/about-time-sales.html........................................................4

CMEG, Annual Report (Form 10-K) (Feb. 28, 2012), *available at* http://www.sec.gov.......11

Defendants CME Group, Inc. ("CMEG"), Kathleen Cronin, and Joseph Adamczyk (together, the "CMEG Defendants") jointly submit this memorandum of law in support of their motion pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) to dismiss Plaintiff's amended complaint in the above-captioned matter.

## PRELIMINARY STATEMENT

Stephen A. Miller ("Plaintiff") claims to have suffered losses trading treasury futures contracts. His amended complaint speculates that defendant Pacific Investment Management Company LLC ("PIMCO") manipulated that market in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.* Plaintiff concedes, however, that he does not have access to PIMCO's trading information and thus does not have any factual basis for accusing PIMCO. (*See* Am. Compl. at 16 ("That information is neither publicly available nor available to the plaintiff absent discovery.")) He bases his claim against PIMCO on (1) television interviews with PIMCO's CEO, who opined that the price for 10-year U.S. Treasury notes would drop to a "new normal" (*id.* at 9-10); and (2) PIMCO's settlement of an unrelated action based on alleged market manipulation occurring more than five years prior to the time period referenced in Plaintiff's amended complaint. (*Id.* at 2, 4, 6-7, 18-19.)

Before filing this lawsuit, Plaintiff presented these same unsupported accusations against PIMCO to a subsidiary of CMEG and multiple federal agencies, including the United States Commodity Futures Trading Commission ("CFTC"), the Department of Justice, the Chief of the Securities and Fraud Task Force for the Southern District of New York, the U.S. Attorney's Office for the Southern District of New York, the U.S. Attorney's Office for the District of Connecticut, and the Federal Bureau of Investigation. (*Id.* at 7-9, 19.) Each declined to take action against PIMCO. Unhappy with these results, Plaintiff brought this action against

PIMCO seeking to recover damages he allegedly sustained trading treasury futures contracts, as well as "punitive monetary sanctions" and compensation for the time he "spent searching for a competent lawyer" and preparing this lawsuit. (*Id.* at 8-9, 20.)

Plaintiff also names as defendants in this action CMEG, CMEG's General Counsel, Kathleen Cronin, and CMEG's Director of Global Enforcement, Joseph Adamczyk. Plaintiff does not (and cannot) state a claim against any of the CMEG Defendants.

Plaintiff sued CMEG in the mistaken belief that it is the self-regulatory organization ("SRO") responsible for futures trading at the Board of Trade of the City of Chicago, Inc. ("CBOT"). CMEG is the parent of CBOT and has no independent self-regulatory responsibilities. Assuming that Plaintiff were to substitute CBOT as the correct party, it is clear that the only claim against CBOT is that it failed to bring a disciplinary action against PIMCO after it investigated Plaintiff's manipulation complaint. But that decision is not subject to collateral attack in this Court. Setting aside the fact that Plaintiff cannot link his purported "damages" (the source of which is unclear) to CBOT's investigation of an alleged manipulation that Plaintiff claims already had occurred, CBOT is entitled to absolute immunity from suits based on its performance of regulatory, quasi-governmental functions pursuant to the CEA.

Although the CEA carves out a limited exception to this immunity and permits investors to pursue claims against exchanges for actual damages caused by an exchange's failure to enforce its rules, that provision does not apply here. CMEG is not an exchange, and therefore neither it nor its employees can be sued under the CEA. Even if Plaintiff were to substitute CBOT as the correct party, Plaintiff does not cite a single rule that CBOT allegedly failed to enforce, let alone how CBOT failed to enforce its rules. Nor does Plaintiff allege (as he must to

state a claim under the CEA) any facts suggesting that CBOT or the CMEG Defendants acted in bad faith or that their actions caused his alleged damages.

With respect to the individual CMEG Defendants, Plaintiff cites no facts connecting Ms. Cronin and Mr. Adamczyk to any allegations in the amended complaint. Plaintiff's assertion that Ms. Cronin and Mr. Adamczyk "refused to do their job" (*id.* at 16) is not a cognizable claim under any source of law and falls well short of federal pleading standards. Ms. Cronin and Mr. Adamczyk should be dismissed from the case for this reason alone.

For all the reasons discussed herein, this Court should dismiss with prejudice Plaintiff's claims against the CMEG Defendants.

## BACKGROUND AND AMENDED COMPLAINT

CMEG is the parent holding company of four commodities exchanges that are registered with the CFTC as designated contract markets under the CEA.[1] Each of these exchanges is a SRO that is authorized and required to enforce the CEA, CFTC regulations, and exchange rules. *See* 7 U.S.C. § 7(d); *see also Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*, 735 F.2d 653 (2d Cir. 1984) (describing the self-regulatory structure for commodities exchanges); *Am. Agric. Movement, Inc. v. Bd. of Trade of the City of Chicago*, 977 F.2d 1147 (7th Cir. 1992) (same). Through the enforcement of these rules and regulations, the exchanges are required to, among other things, provide fair markets for trading. The CFTC oversees the exchanges' compliance with these obligations. *See* 7 U.S.C. §§ 7(d), 13a, 13a-1.

---

[1]    CMEG's exchanges are the Chicago Mercantile Exchange, Inc., CBOT, the New York Mercantile Exchange, Inc., and the Commodity Exchange, Inc. *See* www.cmegroup.com. Although he did not identify the exchange on which he traded in his amended complaint, Plaintiff alleges that he lost money trading treasury futures and options contracts (Am. Compl. at 15), presumably on CBOT. *See* http://www.cmegroup.com/trading/interest-rates/.

*(cont'd)*

One of the many commodities traded on CMEG's exchanges is treasury futures contracts, the subject of Plaintiff's amended complaint. CBOT is the CMEG exchange that offers treasury futures contracts. CBOT offers multiple treasury futures and options products including 5-year note contracts, 10-year note contracts, and 30-year bond futures contracts. (Am. Compl. at 9.) Investors throughout the world trade these contracts on CBOT by utilizing an electronic trading platform.[2] (*Id.* at 12, 14.)

Plaintiff purportedly traded treasury futures products offered on CBOT. (*Id.* at 15.) Although he does not identify which treasury futures or options products he traded, when he traded such contracts, or which specific contracts he lost money on, he claims that he lost $26,800 from his "account." (*Id.* at 8, 15.) He presumably sustained his losses at some point between July and September 2010 when he claims that PIMCO manipulated the market. (*Id.* at 9-10.)

Upon realizing his trading losses, Plaintiff performed his own "audit" whereby he analyzed public time and sales data over the period in question, which showed increased trading in treasury futures contracts every time the DOW Jones Industrial Average ("Dow") dropped by thirty points or more. (*Id.* at 10-12.) This public data provides the price and time of trades, but does not identify the trading parties. (*Id.* at 16); *see also* http://www.cmegroup.com/trading/about-time-sales.html. Thus, Plaintiff's audit did not indicate who made the trades in question or whether such trades were made by more than one party. (Am. Compl. at 16.)

_____

*(cont'd from previous page)*

    For a more detailed description of designated contract markets and their requirements and responsibilities, *see* http://www.cftc.gov/IndustryOversight/TradingOrganizations/index.htm

[2]    Treasury futures contracts are also traded via open outcry.

Despite conceding that he has no factual basis for ascertaining from this data who was trading in treasury futures contracts (*id.* at 16), Plaintiff postulates that a PIMCO "bidding computer program" must have been the sole cause of increased trading in treasury futures contracts during this period. (*Id.* at 2, 10, 15.) He reached this conclusion based on his disagreement with broadcast comments made by PIMCO's CEO about risk averse investors increasingly turning to bonds in mid-2010. (*Id.* at 9-11.)

According to Plaintiff, PIMCO's CEO (who is also a defendant in this matter) appeared on "CNBC and Bloomberg claiming repeatedly there would become a 'new normal' price for the 10 year US Treasury notes that he predicted would drop from [their] normal yield range of between 5.5% to 3.5% . . . to a 'new normal' yield of 2.5%." (*Id.* at 9-10.) As PIMCO's CEO explained, in August 2010, investors were becoming more risk averse causing net inflows into bond funds to reach $120 billion for the year. (*Id.* at 10.)

From these statements, Plaintiff posits that PIMCO, not risk-averse investors or other traders, caused the "new normal" to come true by using a computer program to repeatedly bid on treasury futures contracts every time the Dow dropped thirty points or more, thereby artificially increasing the price for treasury futures contracts during the period of July to September 2010.[3] (*Id.* at 9-10.) Notably, other than these market commentaries, Plaintiff cites no factual basis for his belief that PIMCO was in fact the cause of increased trading, nor does Plaintiff assert any factual basis for his purported knowledge of PIMCO's trading methods.

Although Plaintiff blames a PIMCO "bidding computer" for the fluctuations in treasury futures prices during this period, a more plausible explanation for the market movement

---

[3]  According to Plaintiff, by driving up the price of treasury futures contracts, PIMCO made the "new normal" come true because the price of treasury futures contracts is inversely correlated to treasury yields, *i.e.*, as prices go up, yields go down. (Am. Compl. at 9-10.)

is apparent from his amended complaint. According to Plaintiff, there is a "false[] but commonly accepted" theory regarding the relationship between stocks and U.S. treasuries. (*Id.* at 10.) This "myth" as Plaintiff calls it, is that U.S. treasuries are a safe investment when the stock market is falling, so decreases in the Dow are commonly correlated with increases in trading for U.S. treasuries. (*Id.* at 2, 10.) Simply stated, when stocks seem riskier, investors turn to debt alternatives such as U.S. treasury bonds. Although Plaintiff believes this theory is false, he recognizes that it is "commonly accepted." (*Id.* at 10.) In fact, in his amended complaint, Plaintiff alleges that he is the only person who disagrees with this commonly accepted belief. (*Id.* at 4 ("There is nobody but the plaintiff who states unequivocally that Treasuries are dangerous and scoffs at the absurd, nonsensical claim 'Treasuries are a safe haven[.]'")) Thus, by his own recognition, Plaintiff's amended complaint undermines his theory of manipulation.

In contrast to Plaintiff's detailed (though nonsensical) allegations against PIMCO, his allegations against the CMEG Defendants are basically non-existent.[4] Generally, Plaintiff complains that the CMEG Defendants did not respond to his complaint and theory of manipulation with the results he had hoped for. When Plaintiff provided CMEG with his "audit file" showing "the precise times for each of the 90 consecutive manipulations," Plaintiff contends CMEG should have "report[ed] the gargantuan positions to the CFTC and DOJ, to fulfill and comply with the (SRO) status."[5] (*Id.* at 12.) Plaintiff also complains that when CMEG investigated Plaintiff's complaint, it should have provided Plaintiff with trader-specific details to

---

[4]   Plaintiff's amended complaint, which he filed after all of the defendants moved to dismiss his original complaint, does not contain any new allegations against the CMEG Defendants.

[5]   Plaintiff fails to explain how he could possibly be prejudiced by CBOT's or CMEG's decision to not report his hypothesis to the CFTC and the Department of Justice in light of the fact that he had already complained to these entities himself. (*Id.* at 8, 19.) Indeed, Plaintiff does not (and cannot) allege that the CMEG Defendants or CBOT has any specific duty to report every such complaint to these government entities.

show who was purchasing treasury futures contracts during this time period. According to Plaintiff, CMEG claimed that this "information which they are privileged to know must be hidden at the expense of all other traders on the short side of the Treasury market." (*Id.* at 12.) In conclusory terms, Plaintiff also alleges that "[t]he enormous size of the single trader bidding prices higher could not be missed by the surveillance of the CME Group"[6] and that the scheme was "cover[ed] up by the CME." (*Id.* at 12, 20.) Similarly, according to Plaintiff, the individual CMEG Defendants, Ms. Cronin and Mr. Adamczyk, "both refused to do their job creating a conflict of interest with all Treasury futures and options traders during July, August, and September 2010." (*Id.* at 16.)

This is the sum of Plaintiff's allegations against the CMEG Defendants—he complained to them and they did not respond with the answers he wanted, and now he is suing them. Although these are his only direct accusations against the CMEG Defendants, Plaintiff attempts to cloud the issues (even more) by making several irrelevant and baseless allegations that he seems to think support his argument. These allegations begin with his assertion that the CMEG Defendants' liability is somehow demonstrated by CMEG's involvement in an unrelated action involving MF Global and its former CEO, Jon Corzine. (*Id.* at 15-16.) But Plaintiff does not stop there. He also compares the CMEG Defendants' response to his complaints of manipulation to "the Penn State decision to protect [Jerry] Sandusky." (*Id.* at 5.) In addition, Plaintiff complains about a 2004 action involving PIMCO, the 2008 mortgage crisis, JP Morgan's recent $5 billion trading loss, allegedly fraudulent campaign contributions, the media's

---

[6]    Although Plaintiff characterizes his "audit" as reflecting "enormous" "single trader" bids, he cites no facts that suggest any "single trader," as opposed to a number of different traders, was responsible for increased trading of treasury futures contracts when the stock market declined. The Court should not credit conjecture.

daily focus on same sex marriage, unemployment, and the economy in general. (*Id.* at 18.) Although colorful, these allegations do nothing to support Plaintiff's claims.

## ARGUMENT

Plaintiff's exact cause of action against the CMEG Defendants is unclear. Plaintiff seems to be complaining that the CMEG Defendants did not discipline PIMCO or refer PIMCO to the CFTC (the "Disciplinary Claim"), but he also cites Section 22 of the CEA, 7 U.S.C. § 25, which provides a private right of action for investors to recover actual damages that are caused by an exchange's failure to enforce its rules (the "CEA Claim") (collectively, the "Disciplinary and CEA Claims"). (Am. Compl. at 12, 14-16.) In any event, Plaintiff's amended complaint fails because (1) he has not satisfied federal pleading standards; (2) CBOT, not CMEG and its employees, is the proper party for the Disciplinary and CEA Claims; (3) even assuming Plaintiff substitutes CBOT as the proper party, CBOT is entitled to absolute immunity from the Disciplinary Claim; and (4) Plaintiff has failed to plead bad faith and loss causation that is required to state a CEA Claim. In addition, Plaintiff's request for punitive damages is not available in this matter. Accordingly, this Court should dismiss the amended complaint against the CMEG Defendants with prejudice.

## I.   PLAINTIFF'S AMENDED COMPLAINT FAILS TO SATISFY THE PLEADING REQUIREMENTS OF RULES 8(a) AND 9(b)

In order to survive a motion to dismiss, a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept all specific factual allegations as true but is not required to accept legal conclusions or mere conclusory factual statements. *Twombly*, 550 U.S. at 556.

Furthermore, when an alleged commodity manipulation scheme sounds in fraud, the plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) (citing *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677(NRB), 2007 WL 1946553, *4-5 (S.D.N.Y. June 28, 2007). Rule 9(b) requires that the plaintiff plead the circumstances constituting fraud with particularity. *In re Amaranth*, 587 F. Supp. at 528. To satisfy these requirements "in the context of a [CEA] market manipulation claim, the plaintiff must specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *In re Crude Oil*, 2007 WL 1946553, at *6. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *In re Amaranth*, 587 F. Supp. 2d at 529 (citations and quotations omitted).

Plaintiff's amended complaint falls well short of satisfying these pleading standards with respect to his claims against CMEG. In fact, his amended complaint does not contain a single factual allegation that would support a claim against CMEG. In wholly conclusory fashion, Plaintiff alleges that CMEG failed to "report the gargantuan positions to the CFTC and DOJ." (Am. Compl. at 12.) This statement does not even come close to establishing a facially plausible claim.

Plaintiff's allegations against the individual CMEG Defendants, Ms. Cronin and Mr. Adamczyk, are even more lacking. Plaintiff does not allege any facts that would support a claim against these individuals or that even connect these individuals to the issues addressed in his amended complaint. Plaintiff's only allegation is that Ms. Cronin and Mr. Adamczyk "refused to do their job." (*Id*. at 16.) This allegation, which is wholly conclusory and unsupported by any factual assertions, does not satisfy federal pleading standards.

In short, Plaintiff's amended complaint is "replete with innuendo and devoid of detail." *In re Crude Oil*, 2007 WL 1946553, at *7 (dismissing commodity manipulation complaint). For this reason alone, this Court should dismiss Plaintiff's claims against the CMEG Defendants.

Moreover, Plaintiff's other filings in this matter make it clear that he wants to use this lawsuit to conduct a court-sanctioned investigation of his speculative manipulation theory without regard to whether he has stated a legally viable claim. (*See* Dkt. No. 32 (Plaintiff's "Motion Requesting the Court to Examine Defendant's Large Trader Reports to the CFTC[,]" filed in response to the CMEG Defendants' initial motion to dismiss); Dkt. No. 27 at 1-2 (Plaintiff's response to the CMEG Defendants' initial motion, arguing that Rule 12(b)(6) is unconstitutional.)) It is evident that Plaintiff brought this action based on nothing but personal conjecture and speculation, and he believes that he should be granted access to discovery to test his theories. (*See* Am. Compl. at 5 (Plaintiff arguing that he should not be required to state a legally viable claim before proceeding to discovery.)) Plaintiff's position, of course, is contrary to well-accepted law, as this Court recognized in denying his motion seeking to have the Court examine documents in response to the CMEG Defendants' initial motion to dismiss. Plaintiff

must first state a legally viable claim before proceeding to discovery, and because his amended complaint fails to do so, it should be dismissed with prejudice.

## II.      CMEG IS NOT THE PROPER PARTY TO THIS CASE

Plaintiff's Disciplinary and CEA Claims against the CMEG Defendants should be dismissed because CMEG is not the proper party to this case. Plaintiff's claims both proceed under the faulty premise that CMEG is a commodities exchange. CBOT, not CMEG, is the commodities exchange responsible for treasury futures markets.

Plaintiff's Disciplinary Claim is based on his allegations that (1) CMEG is a "commodities exchange that claims to be a Self-Reporting Organization" (Am. Compl. at 15), and (2) as a "Self-Reporting Organization," CMEG should have disciplined PIMCO and "report[ed]" PIMCO to "the CFTC and DOJ." (*Id.* at 12.) However, CMEG is not a commodities exchange, and therefore it is not required to perform self-regulatory responsibilities. [7] Accordingly, CMEG cannot be held liable for failing to discipline PIMCO or for failing to report PIMCO to the CFTC. For this same reason, Plaintiff's CEA Claim against the CMEG Defendants also fails to state a claim. Because CMEG is not a commodities exchange, neither it

---

[7]      *See* http://www.cftc.gov/IndustryOversight/TradingOrganizations/index.htm (select List of DCMs) (providing a list of exchanges registered as designated contract markets under the CEA, which includes CMEG's exchanges but not CMEG itself); 7 U.S.C. § 7(d) (requiring only designated contract markets or boards of trade to enforce rules to provide, among other things, fair markets for trading); *see also* CMEG, Annual Report (Form 10-K) (Feb. 28, 2012), p. 5, Ex. 21.1, *available at* http://www.sec.gov (explaining CMEG's holding company status and providing a list of its subsidiaries).

This Court may take judicial notice of these publicly available materials and consider them on a motion to dismiss. *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (stating that on a motion to dismiss, a court may consider public SEC filings and other facts that the court may take judicial notice of under Federal Rule of Evidence 201 because they are readily available and not subject to reasonable dispute). Moreover, even if this Court accepts as true Plaintiff's assertion that CMEG is a commodities exchange with SRO authority under the CEA, Plaintiff's amended complaint still fails to state a claim against the CMEG Defendants for all the reasons discussed herein: (1) as an SRO, CMEG (and the individual CMEG Defendants) would be equally entitled to absolute immunity from Plaintiff's Disciplinary Claim (*see infra*, Sec. III), and (2) Plaintiff does not allege facts showing bad faith or loss causation against the CMEG Defendants (*see infra*, Sec. IV).

nor its employees can be held liable under Section 22 of the CEA, 7 U.S.C. § 25(b)(5), which provides the exclusive remedy for investors to bring CEA claims *against an exchange* for a failure by the exchange to enforce its rules. Moreover, even if Plaintiff could state a claim against CBOT (which he cannot, *see infra*, Secs. III-IV) CMEG may not be held liable solely as the holding company for CBOT, the exchange responsible for overseeing trading of treasury futures contracts. *See In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 514-16 (S.D.N.Y. 2004) (dismissing claims against corporate parent companies where the plaintiff failed to allege any wrongful conduct on the parents' behalf).

## III.   PLAINTIFF'S DISCIPLINARY CLAIM IS BARRED BY ABSOLUTE IMMUNITY

Even assuming that Plaintiff were to substitute CBOT as the correct party, his Disciplinary Claim still fails. CBOT, as an SRO, is entitled to absolute immunity from claims based on its decision to not bring a disciplinary action against PIMCO and to not report PIMCO to the CFTC after it investigated Plaintiff's manipulation complaint.

Absolute immunity, which provides complete protection from suit, traditionally applied to government officials performing discretionary tasks, such as judges, prosecutors, and others involved in the judicial process. *See In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007); *Barbara v. N.Y. Stock Exch.*, 99 F.3d 49, 58 (2d Cir. 1996); *Mandelbaum v. N.Y. Mercantile Exch.*, 894 F. Supp. 676, 678 (S.D.N.Y. 1995). The purpose of this immunity is to provide these officials with an appropriate amount of discretion so that they are free to perform their jobs without fear of being repeatedly harassed in private litigation by those who are unsatisfied with official conduct. *See In re NYSE*, 503 F.3d at 95 (the purpose is to prevent those performing these tasks from feeling "'constrained in making every decision by the consequences . . . of [their] own potential liability in a suit for damages.'") (citing *Imbler v. Pachtman*, 424

U.S. 409, 424-25 (1976)). Although this doctrine traditionally applied to government officials, the decision to apply absolute immunity from suit "depends upon the nature of the governmental function being performed," not the identity of the actor performing it. *Barbara*, 99 F.3d at 58. Thus, this doctrine has been extended to cover private individuals or entities that perform government functions. *See Mandelbaum*, 894 F. Supp. at 678 (citing *Austin v. Nat'l Ass'n of Sec. Dealers*, 757 F.2d 676 (5th Cir. 1985)).

As the Second Circuit has recognized, the reason for extending absolute immunity to private parties "is particularly appropriate in the unique context of the self-regulation of national securities exchanges." *Barbara*, 99 F.2d at 58. As SROs, such exchanges "perform[] a variety of regulatory functions that would, in other circumstances, be performed by a government agency"—an agency that would be protected by sovereign immunity for performing the same functions. *Id.* Accordingly, SROs and their officers and employees are protected by absolute immunity when performing functions "pursuant to [their] quasi-governmental role in the regulation" of markets. *In re NYSE*, 503 F.3d at 96. In explaining the application of absolute immunity to such an exchange, the Second Circuit stated:

> The NYSE, as a SRO, stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring compliance with those laws. It follows that the NYSE should be entitled to the same immunity enjoyed by the SEC when it is performing functions delegated to it under the SEC's broad oversight authority.

*D'Alessio v. N. Y. Stock Exch.*, 258 F.3d 93, 105 (2d Cir. 2001).

The Second Circuit has extended absolute immunity to protect SROs from suits arising out of a variety of quasi-governmental functions. *In re NYSE*, 503 F.3d at 96. Most significantly, that court has held that an "[e]xchange is immune from damages claims with respect to its conduct of disciplinary proceedings." *Barbara*, 99 F.3d at 59; *see also In re NYSE*, 503 F.3d at 96. Moreover, this immunity applies equally to protect both exchange disciplinary

actions and refusals to act. *Id.* at 97 ("If an SRO's exercise of a governmental power delegated to it deserves absolute immunity, the SRO's nonexercise of that power also entitles it to immunity.").

The same is true with respect to commodity exchanges, which operate as quasi-governmental organizations that are authorized and required to enforce the CEA, CFTC regulations, and exchange rules to provide fair markets for trading. *See* 7 U.S.C. § 7(d); *see also Barbara*, 99 F.3d at 58; *Mandelbaum*, 894 F. Supp. at 678. Just like the New York Stock Exchange's relationship with the SEC, commodities exchanges stand in the shoes of the CFTC in performing tasks to regulate commodities markets. Therefore, these exchanges and their employees and agents are protected by absolute immunity when performing those functions.

In fact, on multiple occasions courts in this district have held that a commodity exchange was entitled to absolute immunity for performing functions pursuant to their authority under the CEA. *See Mandelbaum*, 894 F. Supp. at 679-81; *Gugliaro v. N.Y. Coffee, Sugar & Cocoa Exch., Inc.*, No. 96 Civ. 4942(JSM), 1997 WL 109442, *3-4 (S.D.N.Y. Mar. 11, 1997). Specifically, in *Mandelbaum* and *Gugliaro*, former exchange members who were unsatisfied with the results of exchange disciplinary proceedings brought suit against the exchanges asserting a variety of claims. *Mandelbaum*, 894 F. Supp. at 679-81; *Gugliaro*, 1997 WL 109442, at *3-4. The defendants in these matters were the exchanges and the individuals involved in the disciplinary proceedings, including exchange investigators. *Id.* In both cases, the court held that the defendants were entitled to absolute immunity. *Id.*

The same is true in this matter. In evaluating complaints and determining whether to institute disciplinary proceedings, CBOT performed quasi-governmental functions. *See Barbara*, 99 F.3d at 58. If CBOT had instituted a disciplinary action against PIMCO based on

14

Plaintiff's complaints of manipulation, CBOT would be entitled to absolute immunity for any claims arising out of that disciplinary action, from PIMCO or anyone else. *See Mandelbaum*, 894 F. Supp. at 679-81; *Gugliaro*, 1997 WL 109442, at *3-4. And because absolute immunity protects both actions and refusals to act, CBOT is entitled to the same immunity for choosing to not discipline PIMCO after receiving Plaintiff's complaints. *See In re NYSE*, 503 F.3d at 97. Moreover, to the extent that Plaintiff's amended complaint can be construed to allege that the CMEG Defendants were responsible for helping CBOT fulfill its self-regulatory responsibilities, the CMEG Defendants are equally entitled to absolute immunity from liability for any decisions made or actions taken on behalf of CBOT in furtherance of CBOT's self-regulatory responsibilities in this matter.

The purpose of this immunity and CBOT's relationship with the CFTC further support a finding that CBOT and its employees and agents are protected by absolute immunity. In the absence of the SRO structure, Plaintiff would have complained directly to the CFTC, and if Plaintiff had then sued the CFTC for failing to institute a disciplinary proceeding, the CFTC would be protected by sovereign immunity. Plaintiff appears to recognize this limitation, as he initially complained to the CFTC but did not include it (or any of the other federal agencies to which he complained of the alleged manipulation) in his amended complaint. CBOT, and its employees and agents, should be entitled to no less protection for stepping into the shoes of the CFTC and performing the regulatory, quasi-governmental functions that it is required and authorized to perform by the CEA. *See Mandelbaum*, 894 F. Supp. at 678; *Gugliaro*, at *3-4.

IV.    **PLAINTIFF'S AMENDED COMPLAINT FAILS TO STATE A CEA CLAIM BECAUSE HE HAS NOT PLED FACTS SHOWING BAD FAITH OR LOSS CAUSATION**

Another possible interpretation of Plaintiff's amended complaint is that he is attempting to assert a claim against the CMEG Defendants under Section 22 of the CEA.[8] Section 22 of the CEA provides a private right of action for investors to recover actual damages that are caused by an exchange's failure to enforce rules and regulations. 7 U.S.C. § 25(b).[9] Essentially, through this section, Congress has abrogated commodity exchanges' SRO immunity for a narrow set of claims that meet the standards expressed therein. This potential remedy is the exclusive option for investors to bring CEA claims against an exchange. *See Vitanza v. Bd. of Trade of the City of N.Y.*, No. 00 CV 7393 (RCC), 2002 WL 424699, at *3 (S.D.N.Y. Mar. 18, 2002) (Section 22 "explicitly enumerate[s] the exclusive circumstances under which a private litigant may assert a right of action for violations of the CEA or CFTC regulations.") (citing 7 U.S.C. § 25(b)(5)).

As noted above, Plaintiff cannot state a Section 22 claim against CMEG or its employees because CMEG is not a commodities exchange. Assuming that Plaintiff were to substitute CBOT as the proper party, the amended complaint still fails to state a claim under Section 22 of the CEA. Although Plaintiff cites this section, he does not actually refer to any rule that CBOT allegedly failed to enforce nor does he explain how CBOT failed to enforce any of its rules. These failures alone are fatal to Plaintiff's CEA Claim. Moreover, Plaintiff has not set

---

[8]    Plaintiff refers to Section 22 multiple times in his amended complaint, though he seems to rely on the subsection applicable to market participants, not exchanges. (Am. Compl. at 14, 20.)

[9]    Specifically, Section 22 provides, in part: "[A] licensed board of trade that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by the [CFTC] . . . shall be liable for actual damages sustained by a person who engaged in any transaction on or subject to the rules of such registered entity to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce . . . ."

forth any possible CEA Claim against CBOT (or the CMEG Defendants) because he has not pled bad faith or loss causation.

### A.      Plaintiff Has Failed to Plead Bad Faith

In order to state a claim against an exchange under Section 22, a plaintiff must plead facts sufficient to show that the exchange acted in bad faith. 7 U.S.C. § 25(b)(4) ("A person seeking to enforce liability under this section must establish that the registered entity, registered futures association, officer, director, governor, committee member, or employee acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss."). This "bad faith requirement governs claims of both exchange action and inaction." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 780 (2d Cir. 1984) (citing *Sam Wong*, 735 F.2d at 670). "A claim of bad faith must be supported by two allegations: first, that the exchange acted or failed to act with knowledge; and second, that the exchange's action or inaction was the result of an ulterior motive." *Id.* (citations omitted); s*ee also W. Capital Design, LLC v. N. Y. Mercantile Exch.*, 180 F. Supp. 2d 438, 441 (S.D.N.Y. 2001) (stating that "[b]ad faith requires wrongful knowledge, and failure to act on that knowledge with a motive ascribable to malfeasance"). With respect to this second requirement, the Plaintiff must plead sufficient facts to show that "self-interest or other ulterior motive unrelated to proper regulatory concerns . . . constitute[d] the sole or the dominant reason for the exchange action" or inaction. *Sam Wong*, 735 F.2d at 677; *see also Minpeco, S.A. v. Hunt*, 693 F. Supp. 58, 61 (S.D.N.Y. 1988).

Plaintiff does not even attempt to plead bad faith. Nowhere in Plaintiff's amended complaint does he allege that the CMEG Defendants (or CBOT) were aware of the alleged manipulative conduct before it occurred or that they refused to prevent or stop it because of self-interest or some ulterior motive unrelated to proper regulatory concerns. In fact, contrary to

17

alleging that the CMEG Defendants acted in bad faith, Plaintiff asserts that they do not even understand the allegedly improper trading strategy. (Am. Compl. at 2 ("the CMEG, the CFTC, the SEC, the DOJ, and the Judicial Branch are too unsophisticated and too uneducated to understand this improper derivatives strategy.")) Thus, Plaintiff has failed to state a claim under Section 22 of the CEA.

### B.      Plaintiff Has Failed to Plead Loss Causation

Plaintiff's complaint also fails to state a claim under Section 22 because he has not alleged loss causation. As mentioned above, Section 22 only provides a right of action for actual damages caused by an exchange's failure to enforce its rules. 7 U.S.C. § 25(b). Here, Plaintiff only alleges that the CMEG Defendants failed to discipline PIMCO after the alleged manipulation had already occurred. Thus, because Plaintiff has not alleged any failure to enforce that actually caused his alleged losses, he has failed to state a claim under Section 22.[10]

## V.      PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES IS NOT AVAILABLE IN THIS MATTER

Although Plaintiff's amended complaint fails to set forth any plausible claim against the CMEG Defendants (or CBOT) for all the foregoing reasons, it is worth noting that part of Plaintiff's requested remedy also is not available in this matter. As mentioned above, in addition to "actual damages" that he allegedly sustained due to the alleged manipulation, Plaintiff asks this court to grant "punitive monetary sanctions," a remedy which is not available under the CEA.

Section 22 of the CEA only allows a plaintiff to recover actual damages caused by an exchange's failure to enforce its rules. 7 U.S.C. § 25(b)(1), (5). Punitive damages are not

available in a CEA action against an exchange or its employees. 7 U.S.C. § 25(b)(1); *see also*

*Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 669 F. Supp. 1244, 1265-66

(S.D.N.Y. 1987) (striking plaintiff's request for punitive damages and finding that such relief is

not available in CEA actions). Plaintiff's request for punitive damages thus fails as a matter of

law.

---

*(cont'd from previous page)*

[10]   Plaintiff's failure to plead loss causation is equally apparent with respect to his requests to recover damages for the lost opportunity to make money, the time he spent looking for an attorney to represent him in this matter, and  the time he has spent preparing this lawsuit himself. (*See* Am. Compl. at 8-9.)

## CONCLUSION

For the foregoing reasons, the CMEG Defendants respectfully request that this Court dismiss this action with prejudice, and request such other and further relief as the Court deems just and proper.

Dated: December 31, 2012

Respectfully submitted,

By: /s/ *Charles F. Smith*

Charles F. Smith, *pro hac vice*
(charles.smith@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
Tel: 312.407.0700
Fax: 312.407.0411

Jerrold E. Salzman
(jerrold.salzman@skadden.com)
Jason T. Manning, *pro hac vice*
(jason.manning@skadden.com)
Brandon R. Keel, *pro hac vice*
(brandon.keel@skadden.com)
155 North Wacker Drive
Chicago, IL 60606
Tel: 312.407.0700
Fax: 312.407.0411

Lauren E. Aguiar
(lauren.aguiar@skadden.com)
Four Times Square
New York, NY 10036
Tel: 212.735.2235
Fax: 917.777.2235

*Counsel for Defendants CME Group, Inc.,
Kathleen Cronin, and Joseph Adamczyk*